[Cite as *State v. Fraker*, 2013-Ohio-4561.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                  CASE NO.  14-12-19

      v.

CHRISTOPHER P. FRAKER,           O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 2011 CR 0201

Judgment Affirmed

Date of Decision:  October 15, 2013

APPEARANCES:

    *Jeff Ratliff* for Appellant

    *Terry L. Hord*  for Appellee

Case No. 14-12-19

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Christopher P. Fraker brings this appeal from the judgment of the Union County Court of Common Pleas finding him guilty of two counts of Endangering Children and sentencing him to prison for a term of seven years. In his three assignments of error, Fraker contends that he was denied effective assistance of counsel at his jury trial and that his conviction was against the sufficiency and manifest weight of the evidence. For the reasons stated below, the judgment is affirmed.

### STATEMENT OF FACTS[1]

{¶2} Fraker is the father of C.F., a minor boy, born in April 2011. The child's mother is Angelica Stevenson. On August 11, 2011, C.F. was taken to an emergency room at Memorial Hospital of Union County in Marysville, Ohio. Afterwards, the child was transported to Nationwide Children's Hospital in Columbus, Ohio, where he was eventually diagnosed with a shaken baby syndrome. Following an investigation by the Union County Children's Services, Fraker was indicted on three charges that resulted from allegations of abuse of his minor child, C.F. Count I charged Fraker with Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the second degree; while Count II charged him with Endangering Children in violation of R.C. 2919.22(A), a felony of the third

---

[1] Although we note that the transcript of trial proceedings contains an anonymous handwritten comment concerning the trial court's staff, as well as other anonymous marks, we have not considered them in arriving at our decision.

-2-

degree, and Count III with Endangering Children in violation of R.C. 2919.22(B)(1), a felony of the second degree. Fraker entered pleas of not guilty and the matter proceeded to a jury trial.

*A. Trial Preparation*

**{¶3}** In the trial preparation process, Fraker's counsel filed a motion for appointment of medical expert arguing that the expert's testimony was indispensable to protect Fraker's constitutional rights. (R. 12, Mot. Appointment Med. Expert, Feb. 10, 2012.) The trial court held a hearing on the motion on February 21, 2012, during which the counsel argued that causation of baby C.F.'s injuries was "the entire issue on this case" and absent a battle of the experts, "the quantity of justice delivered to Mr. Fraker would be remarkably less than really what's needed." (R. 121, Mot. Hearing Tr. at 5, Feb. 21, 2012.) The trial counsel alleged that a defense expert would "discuss shaken baby syndrome, what the ins and outs are on that" and "causation to this -- to this baby." (*Id.*) During the hearing, the trial counsel admitted that he had spoken to a few physicians but had not identified a medical expert that he wanted to retain because one of the physicians "felt that he was inappropriate for it" and another "was out of town." (*Id.* at 7.) Because Fraker's counsel failed to submit any details about the identity of the proposed expert or an estimate amount of funds requested, the court ordered that a ruling on the motion be held in abeyance until further information is

provided. (R. 44, J. Entry, Apr. 2, 2012.) No further information was provided, however, and defense proceeded without its own medical expert testimony.

{¶4} The trial counsel also attempted to subpoena records and elicit testimony regarding Angelica Stevenson's treatment at Consolidated Care Counseling Center, a drug abuse treatment facility. (*See* Subpoenas, Motions, and Journal Entries filed as R. 34, 38, 55, 57, 74, 81, 84.) When the facility refused to disclose the confidential information, the trial counsel filed motions to enforce the subpoenas, and participated in an oral hearing to argue the relevance of the counseling records and the testimony. (*See* R. 57, Mot. Enforce Subpoena, Apr. 9, 2012; R. 81, Supp. Mot. Enforce Subpoena, Apr. 12, 2012; Trial Tr. vol. 2 at 128-46.) Stevenson and the counsel for Consolidated Care were present at the hearing on the issue and Stevenson objected to the disclosure of her confidential counseling records. (Trial Tr. vol. 2 at 128-46.) Fraker's counsel argued that the evidence of Stevenson's drug abuse weighed on the credibility of her testimony as the State's prosecuting witness and was relevant to the issue of alternative causation, suggesting that she had been jeopardizing C.F. by engaging in drug abuse. (*Id.*; *see also* R. 81, Supp. Mot. Enforce Subpoena.)

{¶5} The trial court held that the defense had not established the threshold necessary for disclosure of confidential communications under the federal regulations protecting confidentiality of alcohol and drug abuse patient records, 42

C.F.R. 2.63.[2]  (Trial Tr. vol. 2 at 128-46.)  The court found that the law did not permit for even an in camera review of the records under the circumstances presented at the hearing.  (*Id.*)  Accordingly, Fraker's Motion to Enforce Subpoena was denied and the trial proceeded without the disclosure of Stevenson's counseling records or her counselor's testimony.  (*Id.*)

*B. Trial Testimony Regarding Events Preceding the August 11 Incident*

{¶6} During the five-day jury trial multiple witnesses testified that Stevenson was the primary tenant of an apartment at 668 Kenny Lane in Marysville, Ohio, where she lived with Fraker and her two children, C.F. and Stevenson's minor daughter, S.H.[3]  Stevenson worked as a waitress at McKinley's Grill restaurant at a split shift schedule: from 8:00 a.m. until around 9:30 a.m.-10:00 a.m. for the morning shift, and from about 4:30 p.m. until about 7:30 p.m. for the evening shift.  Fraker was unemployed and was the primary caregiver for the baby C.F. when Stevenson was at work.

{¶7} Stevenson testified about the child's history.  Prior to August 11, 2011, she had never seen C.F. experience any seizure-like reaction and had not noticed any problems with the baby tracking with his eyes.  (Trial Tr. vol. 2 at 202, 219.)  She reported an accident that had occurred when C.F. was four weeks

---

[2] This holding by the Trial Court is not challenged on appeal.

[3] It is unclear whether S.H. was present at the apartment on August 11, 2011.  The record provides inconsistent testimony on that matter.  There is no evidence, however, that S.H. was in any way involved in the incident.  We cite the witnesses' statements regarding S.H. according to the manner they appeared in the respective testimonies.

old: he fell out of the baby swing when he was being watched by Fraker while Stevenson was not home. (*Id.* at 195.) Stevenson further talked about two visits to an emergency room in the month of August due to the baby spitting up. (*Id.* at 196.) She stated that after a formula change, by August 10 C.F. was doing better and was not spitting up as much. (*Id.* at 198-99.) Stevenson testified that Fraker behaved in a "loving manner" towards the baby; she also admitted making prior statements indicating that in her opinion Fraker did not "do this." (*Id.* at 225-28.) She had never seen Fraker shake C.F. or be violent towards him. (*Id.* at 225.) Stevenson admitted that "during that period of time," both she and Fraker had been using either heroin or Percocet 30. (*Id.* at 225.)

**{¶8}** The defense counsel played a recording of a police interview with Stevenson that took place shortly after the August 11 incident. (Trial Tr. vol. 3 at 117-42.) In the interview, Stevenson talked about her daughter S.H. complaining, although inconsistently, that Fraker had hurt her. (*Id.* at 130-31.) In the recording, Stevenson also talked about the swing accident and the subsequent occurrence of bruises on the baby's arms as well as popped blood vessels in his eye. (*Id.* at 133-34.) She concluded that each accident involving harm to her children occurred at a time when she was not home and when Fraker was alone with the children. (*Id.* at 132, 144.) At the same time, she had never seen him lose his temper with the kids, although he did "pop [S.H.] on the butt." (*Id.* at 127, 139.) The recording

further confirmed Stevenson's trial testimony in that although C.F. was fussy in the week before the incident, he was back to smiling by August 11. (*Id.* at 124.) There was also a question regarding Fraker's other child who lived in Marengo— Stevenson commented that Fraker had only seen that child once, "during child support court." (*Id.* at 142.)

{¶9} Fraker took the stand and testified that prior to August 11, 2011, C.F. had been having problems with spitting up, vomiting, and constipation. (Trial Tr. vol. 3 at 149-55, 177.) The child had a hard time sleeping and was fussy, but after the visit to a pediatrician, who recommended feeding changes, he was getting better. (*Id.*) Fraker admitted that other than the formula problems, the baby was bright-eyed and was smiling. (*Id.* at 175-77.) He remembered the baby's feet being blue around August 8, but denied any prior seizure episodes. (*Id.* at 155, 177.) He further testified that C.F. had not been in a car crash or any other serious accident before August 11. (*Id.* at 198-99.) According to Fraker's testimony, "everybody around the complex had watched [C.F.]" for short periods of time, between fifteen minutes and an hour and a half. (*Id.* at 160.) He admitted that he had been ingesting Perc 30 and opiates, but did not remember whether he had ingested any drugs in the month of August 2011 prior the day of the incident. (*Id.* at 161.) He admitted that between August 1 and August 11, he and Stevenson had

little arguments "as always." (*Id.* 163.) He denied any anger management problems but admitted that he would get mad at times. (*Id.* at 167.)

{¶10} Several neighbors who lived on Kenny Lane in the same apartment complex as Fraker and Stevenson testified about their observations of the child in the weeks prior to the August 11 incident.[4] The neighbors knew one another and they frequently socialized together in the common outdoor area of the complex. The testimony was consistent on the fact that while Stevenson was at work, Fraker was C.F.'s primary caregiver.

{¶11} One of the neighbors, Hannah Salmon, who is a certified medical assistant, testified that "very rarely," "almost never" would anyone else other than Fraker or Stevenson watch C.F. (Trial Tr. vol. 1 at 132-33, 135.) She admitted that she had watched the baby once in the past, a month or two prior to the incident, for about twenty minutes. (*Id.* at 133-34.) She had previously noticed bruises on the baby's stomach and stated that the parents' explanation for the bruises was that the baby tried pulling out of his swing and the bruises were the result of the safety belt pulling the baby back. (*Id.* at 136.) She had also observed bruises looking like "fingerprints on the backs of the arms," which the parents explained to her to be the result of picking up the baby. (*Id.*) Admitting that she would rarely see the baby outside, Hannah testified that she had not witnessed the

---

[4] Although we note that there were inconsistencies in the witnesses' testimonies, we refrain from commenting on them, instead relying on the jury's assessments of credibility.

baby crying or vomiting, having seizures, conjunctivitis, or swelling within ten days prior to August 11. (*Id.* at 145-46.) However, a night or two before the August 11 incident, she had seen the baby looking "not very lively," and having "like a bluish kind of tint" to his skin. (*Id.* at 135.) In Hannah's opinion, Stevenson was generally neglectful of the baby, while Fraker had a more "fiery" personality than Stevenson. (*Id.* at 135, 142.)

{¶12} Hannah's twin sister, Sarah Salmon, who is a certified medical assistant, did not remember Hannah ever watching C.F. (Trial Tr. vol.1 at 158, 161.) About three days before the August 11 incident, Sarah noticed the baby's feet, hands, and lips being blue and suggested to Stevenson that the baby's oxygen levels were low. (*Id.* at 161, 168-69, 173.) She offered to take them down to Children's Hospital but Stevenson refused responding that the baby was just being cold. (*Id.* at 161.) Sarah had never seen any "marks" or bruises on C.F. (*Id.* at 161-62.) According to her, Stevenson was "pretty good" with the baby, but she was more prone to emotional outbursts than Fraker. (*Id.* at 159, 170.) Sarah had never seen Fraker shake or hit C.F. and had not seen either parent mistreat the baby. (*Id.* at 168, 173, 175, 178.)

{¶13} Chandra Marshall, another neighbor from the Kenny Lane apartment complex, sometimes babysat C.F. for short periods of time. (Trial Tr. vol. 2 at 150-51.) She saw a bruise on the baby's stomach once and heard the explanation

about C.F. almost falling out of his swing. (*Id.* at 159.) She saw the bruise on his arm that supposedly was from the parents catching the baby when he was about to fall. (*Id.* at 159.) The bruises were observed shortly before the time of the incident. (*Id.* at 161.) Chandra also noticed the baby having "bloodshot eyes," looking "like blood vessels had popped in them," which the parents explained as the result of crying. (*Id.* at 159.) She had never seen any of the children from the neighborhood touch the baby. (*Id.* at 161.) Chandra saw C.F. on August 10 and the baby looked fine. (*Id.* at 153.) She admitted that Stevenson could be temperamental and that both Stevenson and Fraker used drugs. (*Id.* at 162, 163-64, 167.) She witnessed Stevenson leaving the baby unattended inside the apartment. (*Id.* at 166.) She had never seen Fraker shake, hit, or strike C.F. (*Id.* at 161.)

{¶14} Chelsea Marshall, who lived with Chandra, admitted babysitting C.F. once for a short time and identified another neighbor, Angie Baldwin who would also babysit C.F. (Trial Tr. vol. 2 at 168-72, 176-77.) She saw many people visit Stevenson's apartment for short periods of time but had never seen strangers walking between their apartments. (*Id.* at 177-78, 187.) She observed C.F. in August 2011, and noticed bruises on the baby's arms and across his chest about a week prior to the incident. (*Id.* at 173-74.) The day before the incident, the baby looked well; he was happy and healthy. (*Id.* at 174-75.) Chelsea testified that

Stevenson's daughter S.H. was not there during the time at issue because she was with her father in Pennsylvania at the time. (*Id.* at 175.)

{¶15} Angie Cook, who lived across the sidewalk from Stevenson and Fraker, testified about a loving relationship between Fraker and the baby. (Trial Tr. vol. 3 at 68.) She sometimes babysat C.F. and noticed that in the first week of August the baby had bloodshot eyes and a mark on his arm. (*Id.* at 71-73.) She saw the baby every day looking normal, apart from the redness in his eyes. (*Id.* at 84.) On August 11, she saw Fraker outside on the porch with C.F. and Stevenson's daughter, S.H. (*Id.* at 74-75.) Cook also testified about Stevenson's tendency to lie at times and about the fights between Stevenson and Fraker. (*Id.* at 81-82, 83.) On cross-examination, Cook admitted to having convictions for theft and trafficking in food stamps. (*Id.* at 85.)

{¶16} William Wampler testified that in August 2011, he resided at the apartment complex on Kenny Lane "right across the sidewalk" from Stevenson and Fraker. (Trial Tr. vol. 4 at 22.) He saw Fraker every day and, within ten days prior to the August 11 incident, observed C.F. crying a lot and having bloodshot eyes, which the baby's parents blamed upon his constipation. (*Id.* at 25.) Wampler testified that he had never seen Fraker get angry with the child. (*Id.* at 23.) He also testified that Stevenson had a good heart but was immature; she was the dominant person in the relationship, making decisions about the child. (*Id.* at

29-31.) Wampler testified that Fraker had a reputation for truthfulness. (*Id.* at 28-29.) Wampler admitted that at the time of his testimony he was in prison for misuse of credit cards and admitted to other convictions, totaling thirteen felonies. (*Id.* at 26-27, 34.)

{¶17} In addition to the neighbors, other people testified about the child's condition prior to August 11 and about the relationship between the parents and the child.

{¶18} Mary Runyons, who stayed at Stevenson's apartment temporarily in August 2011, testified that Stevenson's daughter, S.H., was not there at the time. (Trial Tr. vol. 2 at 6-9, 13.) On the first night of Runyons' stay at Stevenson's apartment, she noticed the baby's eyes were "glazey," which Stevenson explained as a result of "gerd." (*Id.* at 13.) In Runyons's opinion, "the baby just didn't seem to be all there" at that time. (*Id.*) Runyons watched C.F. on a few occasions for short periods of time and noted that the baby cried a lot but there were no other problems with him. (*Id.* at 11-12.) She saw drug paraphernalia in the apartment that she assumed belonged to Fraker. (*Id.* at 17.) According to Runyons, Stevenson was very emotional and gave off the idea that she could be violent. (*Id.* at 20-21.) She had never seen Fraker shake C.F. (*Id.* at 17.)

{¶19} William (Joey) O'Neill, who stayed at Stevenson's apartment together with Runyons in August 2011, corroborated Runyons's testimony

regarding the drug paraphernalia. (Trial Tr. vol. 2 at 116-17.) He remarked about the baby looking normal but being nonresponsive to a game of peekaboo on the first night when he and Runyons moved in. (*Id.* at 119.) He had never seen Fraker shake or hit the baby. (*Id.* at 118.)

{¶20} Cody Welch, Fraker's friend, testified that he had visited Fraker at Stevenson's apartment "pretty much every day," spending almost all days there; but he was not there on August 11, 2011. (Trial Tr. vol. 3 at 29, 35, 38.) Welch was unsure of whether Fraker had a job in July 2011 and he did not know the baby's birthday. (*Id.* at 43.) He testified that C.F. did not look healthy at the beginning of August, stating that the baby's eyes were "lazy and like wanted to roll in the back of his head." (*Id.*) He did not mention the baby's condition to anyone at that time. (*Id.* at 44.) Welch had never seen Fraker hit Stevenson, but saw Stevenson hit Fraker and experienced Stevenson hitting him and chasing him out of the apartment. (*Id.* at 32-33.) He had never seen Fraker hit C.F. (*Id.* at 38.) On cross-examination, Welch admitted being illiterate. (*Id.* 48.) He also admitted having talked about this case to other witnesses and discussing his testimony with them. This included talking to Debbie Hughes (Fraker's great aunt), Welch's grandmother, the defense attorney, as well as attorney's investigators and secretary. (*Id.* at 62-65.) He confirmed having dinner together with other

witnesses the preceding Saturday, discussing respective testimonies. (*Id.* at 65-66.)

**{¶21}** Dalton Carmean, Fraker's friend, testified that he had visited Fraker in August 2011, about four days a week. (Trial Tr. vol. 4 at 7-8.) He denied seeing Cody Welch in the couple's apartment frequently stating that they "weren't there at the same time very often." (*Id.* at 19.) He was sometimes asked to watch C.F. for short periods of time when Fraker stepped outside to smoke a cigarette, and he noticed C.F. crying excessively in the late July or early August 2011. (*Id.* at 9.) Carmean testified that Fraker was a loving father who had never lost his temper at C.F. (*Id.* at 13.) He further testified to Fraker's open and honest character and stated that he had never seen Fraker mishandle or harm his child. (*Id.* at 13-15, 18.) Carmean called Stevenson a "drama queen" who had more problems with everybody than Fraker. (*Id.* at 18.) He stated that the atmosphere around the apartment complex involved a lot of arguments and drama, but everyone was gathering together outside. (*Id.* at 15-17.) The neighbors would not get into one another's home without invitation, however, and the doors were not left open when the owners were absent. (*Id.* at 17-18.) Carmean was not in the couple's house on the day of the incident. (*Id.* at 12.)

**{¶22}** Tracy Lynn Smith, Fraker's aunt, testified that she had visited the couple about twice a week when they lived in Marysville, staying for about 10 to

30 minutes. (Trial Tr. vol. 3 at 16, 23.) She testified that Fraker was a patient, loving father, while Stevenson could be either extremely happy or extremely angry. (*Id.* at 15, 21-22.) She saw C.F. in August 2011 looking healthy, apart from the busted blood vessels that Stevenson attributed to constipation and crying. (*Id.* at 16-19.) She noted the baby was crying a lot, but she did not see anything she would consider out of ordinary. (*Id.* at 19.) Smith did not see many people go in and out of Stevenson's apartment or other people interacting with the baby outside. (*Id.* at 20, 22.) She had never seen Fraker hit the child. (*Id.* at 22.)

{¶23} Sarah Keeler testified as the mother of Fraker's first child—a two year old daughter born in March 2010. (Trial Tr. vol. 3 at 88-89.) Keeler lived in Marengo, Ohio and she did not visit Fraker in Marysville. (*Id.* at 95.) She testified that Fraker did not get involved with her daughter until after the child's first birthday, but since then he was a really good, "ideal," father. (*Id.* at 89-90.) She had never seen him be violent with her child. (*Id.* at 91.) On cross-examination, Keeler admitted that she was not aware if Fraker had a job; she did not know whether she was receiving child support from him and she did not know where Fraker had lived in August 2011. (*Id.* at 95.) She indicated that she had heard other witnesses discuss the case "somewhat." (*Id.* at 94-95.)

{¶24} Homer Knew, who was a supervisor for Liberty Castings and Assistant Minister for God's Anointed Altar, testified that he had known Fraker

well since Fraker's childhood. (Trial Tr. vol. 4 at 40.) He described Fraker as a "polite young man" and testified that he had never seen Fraker shake a child or do anything wrong. (*Id.* at 41-43.) He "even trusted him around [his] own daughter when she was like 15, 16" to babysit her. (Trial Tr. vol. 4 at 40-41.) Knew only saw Fraker with C.F. once and observed Fraker playing with the child. (*Id.* at 41.) He described the relationship between the two as "loving." (*Id.*)

**{¶25}** Patricia Anderson, Fraker's grandmother who lived in Florida, testified that Fraker and Stevenson had stayed with her in Florida in June 2010. (Trial Tr. vol. 3 at 98-102.) Anderson spent some holidays with Fraker and Stevenson in 2010 and 2011. (*Id.* at 104.) She testified that Stevenson had been "cooperative" with her. (*Id.* at 104.)

**{¶26}** Debbie Hughes, Fraker's great aunt who raised him, testified that she knew Stevenson from the couple's visits to her house but she never had a good relationship with her due to Stevenson's yelling and cussing. (Trial Tr. vol. 3 at *Id.* 223-26.)

**{¶27}** Dr. David Shisila, who was the child's pediatrician and saw the baby on August 9, 2011, testified that C.F. looked well that day. (Trial Tr. vol. 2 at 33-37.) "The eyes appeared normal" and his vitals were normal, but the mother was concerned about the baby's spitting up. (*Id.* at 34-40, 50.) The doctor diagnosed the baby with reflux and formula intolerance and recommended switching to a

more sensitive type of formula. (*Id.* at 39.) There were no other abnormalities. Dr. Shisila was not an expert in the matter of a shaken baby syndrome and had never seen a shaken baby in his office. (*Id.* at 47-48.) When asked about characteristics that he would expect to see in a baby suffering from the shaken baby syndrome, he stated that "[l]ethargy would probably be one," and he would expect mental status changes, vomiting, or refusal to eat. (*Id.* at 47.) He did not see any of those symptoms in C.F. during the visit on August 9, 2012. (*Id.* at 53.) Dr. Shisila was not an expert in retinal or subdural hemorrhages; he was not an expert in child abuse cases and did not know how quickly the symptoms could progress from the time of trauma. (*Id.* at 49, 50, 52.)

{¶28} In addition to the testimony by various witnesses, C.F.'s medical records were admitted into evidence. Those records included emergency department notes from Memorial Hospital of Union County dated August 7, 2011, where the child was seen for "irritability" and was discharged with a finding that he had no serious medical problem. (State's Exhibit 8.) The child's physical exam at that date was normal and revealed no evidence of trauma. (*Id.*)

*C. Testimony About the August 11 Incident*

{¶29} The witnesses who saw C.F. on August 11, 2011, testified that he looked normal prior to the evening's incident. Hannah Salmon testified that she saw the couple with both children, C.F. and S.H. earlier in the day on August 11,

2011, and the baby looked fine. (Trial Tr. vol. 1 at 126, 130.) Chandra Marshall also saw the baby earlier, looking fine. (Trial Tr. vol. 2 at 153.) She testified that Fraker had watched the baby that day and she had not seen anyone else go into the apartment that day. (*Id.* at 157.) Similarly, Sarah Salmon did not recall seeing anyone else visit Stevenson's apartment that day. (Trial Tr. vol. 1 at 166.)

{¶30} Fraker testified that on August 11 he watched the baby alone for majority of the day and there was no one else in the apartment, except for the morning when Mary Runyons and Joey O'Neill were there. (Trial Tr. vol. 3 at 177-79.) He testified that Stevenson had gone to work at around 4:15 p.m. and came back at around 8:40 p.m. (*Id.* at 180.) He was alone with C.F. during that time. (*Id.*) The child did not fall or have any other accident that day. (*Id.* at 198.) He did not lose his temper that day around the baby. (*Id.* at 159.) Fraker testified that, just prior to Stevenson coming home, he had changed the baby and put him down so that he could prepare for the feeding. (*Id.* at 156, 180-82.) He was not consistent in his testimony as to whether the baby was in the crib or the swing at this point. (*Id.* at 156, 180.) The baby looked fine when he was being changed and when he was being put into the crib or the swing. (*Id.* at 181, 185.) Fraker stated that when Stevenson came home, the baby was in the swing after just being changed. (*Id.* at 180.) At this point, Fraker noticed that C.F. "didn't look right in his crib" or "in his swing." (*Id.* at 156, 181.) His testimony was varying as to who

picked up the baby then. At pages 180, 181, 182, and 183 of the Trial Transcript, vol. 3, Fraker testified that Stevenson picked up the baby from the swing. However, on pages 156, 183, and 184, Fraker testified that he had picked up C.F. and, up to that point, Stevenson had not touched the baby.

{¶31} According to that second version, when Fraker was about to feed C.F., he noticed that the baby looked "unnormal"; so he picked him up and noticed that he was limp. (Trial Tr. vol. 3 at 156, 183.) That is when Stevenson "grabbed him from [Fraker] and took off outside." (*Id.* at 156, 183.) Fraker then followed Stevenson outside and took the child from her "so she didn't drop him on accident or hurt him anymore." (*Id.* at 156.) He refused offers of help from Chandra Marshall's mother because she had been drinking and did not accept the help of the Salmon sisters because they had been using heroin. (*Id.* at 157, 188.) He went inside to get car keys and his shirt and then drove off with Stevenson to take the child to the hospital. (*Id.* at 156-57, 189.) At this point, the baby was hardly breathing. (*Id.* at 157.) Fraker testified that when they reached the Community Market parking lot, he pulled over and flagged down the ambulance that was on its way. (*Id.* at 190.) Fraker remembered making statements to a paramedic regarding what had happened to his child but denied advising the paramedic that C.F. had started "shaking and then went limp" while he was holding him. (*Id.* at 190-91.) Fraker went to the hospital in the ambulance and later accompanied the

child when he was being transferred to the Children's Hospital in Columbus, Ohio. (*Id.* at 158, 192.)

**{¶32}** Stevenson testified that on August 11, 2011, C.F. was doing fine and appeared well. (Trial Tr. vol. 2 at 199-200.) In the evening, she left home to go to White Castle, leaving C.F. with Fraker. (*Id.* at 200.) No one else was home with them. (*Id.* at 200-01.) When she came back, she stopped outside to talk to a neighbor and that is when Fraker came to the door, holding C.F. in his hands and stating that something was wrong. (*Id.* at 201.) The baby looked limp, pale; he was not moving, and his eyes were rolled back. (*Id.*) Fraker handed her the baby and she called 911 immediately. (*Id.*) Then, Fraker took the baby out of her hands because she was "freaking out, and did not want him to get hurt even more." (*Id.*) Fraker ran inside, grabbed the car keys and they drove to the emergency room, meeting the medics at a parking lot of Community Market. (*Id.* at 202.) Fraker got into the ambulance with the baby, while Stevenson went to pick up her mother and drove to the emergency room with her. (*Id.* at 203-04.) When Stevenson arrived at the ER, she found out that the baby had had a seizure and was being transferred to the Children's Hospital. (*Id.* at 203-04.)

**{¶33}** In the previously mentioned recorded police interview, Stevenson stated that on August 11, 2011, she had worked a morning shift and arrived home at around 11:00 or 11:30 a.m. (Trial Tr. vol. 3. at 122.) C.F. was doing well and

the whole family spent the day outside up until about 4:45 p.m. (*Id.*) She went back to work in the evening, visited her mom after work, and arrived at her home at about 8:30 or 9:00 p.m., when the incident happened. (*Id.*) The recording further confirmed Stevenson's trial testimony about the events of August 11.

{¶34} The neighbors were outside on the evening of August 11, 2011, when the couple was taking C.F. to the hospital. Each of them testified about their recollection of the event.

{¶35} Hannah Salmon, who was standing outside with other people, claimed that she had seen Stevenson go into the apartment and leave it about 5 to 10 minutes later with Fraker and C.F. (Trial Tr. vol. 1 at 129-31.) Stevenson was holding the baby and was talking to her mother on the phone, repeating that her baby was not breathing. (*Id.* at 130, 143.) At that time, the baby looked blue and limp, and was hanging in the mother's arms. (*Id.* at 130.) Hannah saw the couple get in the car and drive off; she chased the vehicle until she saw the ambulance meet them. (*Id.* at 310-31.)

{¶36} Sarah Salmon saw Stevenson come home, go inside her apartment for about ten minutes and run out saying the baby was not breathing. (Trial Tr. vol. 1 at 163.) According to Sarah, Fraker was coming out of the apartment holding the baby and the baby looked limp. (*Id.* at 164.) Sarah called 911 and offered CPR to the baby, but the couple drove off in their car. (*Id.* at 164-65.)

**{¶37}** Chandra Marshall saw Stevenson arrive home in the evening and leave after about five minutes, screaming, while talking on the phone. (Trial Tr. vol. 2 at 154-55.) Fraker walked outside a couple of minutes later with the baby in his arms. (*Id.* at 155-56.) Her sister, Chelsea saw Stevenson come home from a store and Fraker run outside with the baby looking purple and not breathing. (*Id.* at 180.)

**{¶38}** William Wampler stated that he had observed the incident from his front porch. (Trial Tr. vol. 4 at 24.) Stevenson was holding the baby running out of the apartment, "freaking out," and saying her baby was not moving. (*Id.* at 25.) He observed other people trying to take the baby and he saw Fraker take the baby from Stevenson "so she wouldn't drop him." (*Id.*)

**{¶39}** Sean Rengert, a firefighter paramedic who was an emergency responder to Stevenson's address on Kenny Lane, testified that he met with the family at the Community Market parking lot. (Trial Tr. vol. 1 at 110-12.) At that time, the baby's father advised the paramedic that as he had been holding the child, "[i]t started shaking and then went limp." (*Id.* at 113.) The paramedic observed that the child was "kind of blue," appeared to be in distress, "not very alert or responsive," "lethargic," "listless," and "wiped out." (*Id.* at 112.) Based on the child's condition, the paramedic was under the assumption that the child had suffered a seizure. (*Id.* at 113-14.) Rengert admitted that he would see

seizures in children with a high fever quite often, but in this instance, the child did not have a fever. (*Id.* at 116.) He did not see any signs of bruising or swelling on the child. (*Id.* at 116.) The paramedics took C.F. to an emergency room at Union County Memorial Hospital and, as they were taking the child inside, the baby developed what appeared to be another seizure. (*Id.* at 116.) Rengert did not see Fraker shake or hit C.F. (*Id.* at 120.)

{¶40} Dr. Matthew Sanders, an emergency physician who was working in the ER on August 11, 2011, noted a seizure activity when he first saw the child into the emergency room. (Trial Tr. Vol. 1 at 92-94.) After being qualified as an expert in "medicine emergency room" testimony, Dr. Sanders testified that a seizure may sometimes be explained by a fever and is common in infants. (*Id.* at 92, 95-99.) Noting that this patient had normal temperature at 98.3, the doctor testified that C.F.'s seizure could not have been caused by a fever. (*Id.* at 96.) The doctor further testified that a seizure may be preceded by a trauma. (*Id.* at 99.) Based on the child's history, as related to him by the parents and the child's physician, Dr. Shisila, Dr. Sanders noted that there were no prior seizures or anything that would indicate a possible cause for the seizure. (*Id.* at 100-01.) Dr. Sanders did not notice any swelling, rashes, lesions, or other marks on the child's skin at the time of the examination. (*Id.* at 104.) He diagnosed the child with a seizure and elevated white blood cell count, and ordered the child to be transferred

to Children's Hospital. (*Id.* at 95, 100.) Dr. Sanders did not see Fraker "touch or do anything" to C.F. (*Id.* at 105.)

*D. Testimony About Hospital Stay and Investigation*

{¶41} Dr. Laura Brink, a pediatrician at Nationwide Children's Hospital in Columbus, Ohio, testified as an expert in child abuse pediatrics and as an attending physician who treated C.F. at the Children's Hospital. (Trial Tr. vol. 2 at 54-67.) On August 17, she was asked to provide consultation regarding a possible abuse of C.F. (*Id.* at 67.) Based on the medical records and information provided to her by the mother, it was Dr. Brink's expert opinion that "this child was a victim of a child physical abuse caused by a shaking mechanism." (*Id.* at 87.) Dr. Brink explained her findings as follows.

{¶42} C.F.'s MRI performed on August 17, 2011, revealed subdural hemorrhage (bleeding) overlying the brain. (Trial Tr. vol. 2 at 73-74, 97.) Such hemorrhage is not typical in a three month old child unless it is explained by an accidental injury or a shaking mechanism. (*Id.* at 75.) An example of an injury that could cause subdural hemorrhage would be a child falling from a grocery cart onto a concrete floor or any sort of direct blow to the head. (*Id.* at 76.) Besides the subdural hemorrhage, C.F.'s eye exam revealed extensive retinal hemorrhages within both eyes. (*Id.* at 80.) Dr. Brink testified that retinal hemorrhages of this extent can be caused by very few things, such as "head run over by a car," "child

falling out of a window that's several stories high," and "acceleration/deceleration mechanism or a shaking mechanism." (*Id.* at 82.) This extent of retinal hemorrhages could not be caused by falling from a couch or a baby swing, by throwing the child up in the air, by another child roughly playing with the baby, or by a direct blow to the head. (*Id.* at 76, 83-84, 100.) Rather, this type of hemorrhaging required "forceful action that causes acceleration and deceleration as well as the rotation acceleration" that is especially dangerous to babies because their necks are not very strong. (*Id.* at 76-77.)

{¶43} Dr. Brink pointed out that C.F.'s history was negative for any recent accidents or trauma, other than the swing accident that happened when the baby was one month old. (Trial Tr. vol. 2 at 75, 90.) He had no fractures in the skeleton and no infections. (*Id.* at 72-73.) Without any alternative explanation, the symptoms exhibited by the child indicated a possible physical child abuse. (*Id.* at 78.) Further, C.F.'s symptoms were so dramatic that they must have been caused by an event occurring immediately prior to the child presenting to the hospital. (*Id.* at 85, 88.) Dr. Brink did not exclude the possibility of a prior incident to the baby, but she would not change her opinion as to the fact that the symptoms she had observed resulted from an injury immediately preceding the child's visit to the hospital. (*Id.* 91-92.)

**{¶44}** Dr. Brink admitted that the MRI was not specific as to the date when the bleeds around C.F.'s brain occurred and they could have occurred within the timeframe of up to 7 or 10 days preceding the MRI on August 17, 2011. (Trial Tr. vol. 2 at 95-96.) She also admitted a possibility of rebleeds, a situation where after a child has sustained an injury with a subdural hemorrhage, new vessels may rebleed with a minor trauma as the previous hemorrhage heels. (*Id.* at 95.) Although her examination did not reveal a subconjunctival hemorrhage (bleeding spots on the whites of the eyes), she did not exclude the possibility it could have occurred and subsequently healed prior to her exam. (*Id.* 79, 97-98.) She did not consider the child's blue feet, as reported to have been seen a few days prior to the incident, to be associated with a shaken baby syndrome. (*Id.* at 98.)

**{¶45}** Dr. Brink's opinion as to the timing of the injury-causing event was based on the fact that the child was well earlier in the day on August 11, appearing playful, happy, and healthy, while exhibiting extreme symptoms in the evening. (Trial Tr. vol. 2 at 69, 92, 105.) This anomaly was indicative that the shaking event occurred "within that timeframe." (*Id.* at 105.) Dr. Brink listed several factors that are commonly present in shaken baby scenarios, including drug use, premature or colicky children, children who cry excessively, and an older child having potty training issues. (*Id.* at 101.) She recognized that she had information

about C.F.'s father using heroin and about the mother having used marijuana as a teenager. (*Id.*) She did not see Fraker shake C.F. (*Id.* at 90.)

{¶46} The parties presented some testimony regarding the couple's relations after the August 11 incident and the investigation performed by Children's Services.

{¶47} Fraker testified that he had stayed at Children's Hospital for a couple of nights and then at the Ronald McDonald house with Stevenson. (Trial Tr. vol. 3 at 158.) When there, one night he and Stevenson got into a fight that involved pushing each other, after which Fraker left. (*Id.* at 193.) He stayed with his mother in Marengo, but he continued to visit the hospital. (*Id.* at 194-96.) He found out about the child being diagnosed with a shaken baby syndrome when he was in Marengo getting ready to go to the hospital. (*Id.* at 195-97.) His Aunt Tracy called, telling him about the shaken baby suspicions and telling him "not to come up there." (*Id.*) Fraker admitted having contact with the baby later, after there was an order in place prohibiting such contact. (*Id.* at 197.) He also stated that he had visited Stevenson in her apartment in Marysville each time he was in town. (*Id.* 197.) One of those times he encountered workers from Children's Services and he left. (*Id.* at 197.)

{¶48} Stevenson testified about the physical altercation between Fraker and her when they were staying at the Ronald McDonald house; she stated that Fraker

had choked her and she had pushed him in response. (Trial Tr. vol. 2 at 206, 225.) She denied trying to avoid a meeting with a caseworker from Children's Services who was investigating the child abuse case, but admitted that she had preferred to meet somewhere other than the hospital because it would have been "embarrassing." (*Id.* at 221-22.) Stevenson denied making a statement to the caseworker that C.F. had been thrown across the room. (*Id.* at 218, 224.)

{¶49} Danielle Swindle, an intake caseworker from Union County Children's Services, investigated the allegations of child abuse involving C.F. (Trial Tr. vol. 3 at 207-08.) She testified that both parents had made statements in the course of the investigation. In her phone conversation with Swindle, Stevenson was upset, crying, and "not happy" about the phone call. (*Id.* at 210-11.) Stevenson denied allegations of child abuse and made a comment indicating that the child had been thrown across the room, "in a sarcastic tone of voice." (*Id.* at 210.) Swindle stated she had no reason to believe that Stevenson had been trying to avoid her and she did not recall having problems with obtaining Stevenson's signature on the medical records release form. (*Id.* at 218.) Fraker told Swindle that he had been alone with the baby on the day of the incident. (*Id.* at 216.) According to Fraker's statements to the caseworker, C.F. stopped breathing and went limp when he and the baby were alone inside the apartment, while Stevenson was outside talking to her neighbors. (*Id.* at 216-17.)

*E. Jury Verdict and Sentencing*

**{¶50}** After hearing the above testimony, the jury returned verdicts of guilty on Counts II and III (Endangering Children in violation of R.C. 2919.22(A), a felony of the third degree and Endangering Children in violation of R.C. 2919.22(B)(1), a felony of the second degree). The jury found Fraker not guilty on Count I (Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the second degree). At the sentencing hearing, on June 25, 2012, the trial court found that Counts II and III involved allied offenses that merged for purposes of sentencing and, upon election by the State, Fraker was sentenced on Count III. Fraker appeals his conviction raising three assignments of error.

**First Assignment of Error**

**Appellant received ineffective assistance of counsel to such a degree that Appellant did not receive a fair trial.**

**{¶51}** In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show first, that counsel's performance was deficient in that it fell "below an objective standard of reasonable representation." *State v. Keith*, 79 Ohio St.3d 514, 534, 684 N.E.2d 47 (1997). Second, the defendant must show "that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Id.*, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to demonstrate prejudice, the defendant must prove a reasonable probability that the result of the trial would

have been different but for his or her counsel's errors. *Id.* In applying these standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 108, quoting *Strickland* at 689. Therefore, the court must be highly deferential in its scrutiny of counsel's performance. *State v. Walker*, 90 Ohio App.3d 352, 359, 629 N.E.2d 471 (3d Dist.1993), quoting *Strickland* at 689.

{¶52} Fraker alleges that his counsel was ineffective in four respects: (1) failure to obtain a medical expert who could provide an alternative causation for the child's injuries; (2) failure to proffer substantial testimony and records regarding Angelica Stevenson's drug treatment as this evidence had the tendency to prove alternative causation, i.e., child abuse by Stevenson; (3) failure to object throughout the trial to substantial leading questioning; and (4) failure to object to questioning that suggested coerced testimony on the part of the defense. There is no sufficient evidence in the record to rebut a presumption that the trial counsel's decisions regarding the above challenged steps fell within the scope of reasonable trial strategy, or to show that Fraker was prejudiced by his counsel's assistance.

*(1) Failure to Obtain a Medical Expert*

{¶53} Fraker's trial counsel did initially argue for an appointment of a medical expert but did not pursue the matter further after the February 21, 2012

hearing, during which the court requested detailed information regarding the cost and identity of the proposed expert. We will not speculate about the reasons behind the trial counsel's actions or inactions in this respect because there is nothing to show that Fraker would have been found not guilty had the testimony of the medical expert been provided. First, there's nothing more than a mere speculation in the appellate brief to show that an expert would have testified to an alternative causation. Although the trial counsel argued that an expert would discuss "shaken baby syndrome and causation" and that the battle of the experts was necessary to preserve "quantity of justice delivered to Mr. Fraker" and protect his constitutional rights, we cannot speculate that an *alternative* causation would be argued or established by the expert.

{¶54} Second, there is no indication in the record that an alternative causation would have been supported by the evidence, even if the expert had asserted it. Indeed, the record does not show anything indicating a possible cause for C.F.'s subdural and retinal hemorrhages that would exclude Fraker's involvement. The child did not have any signs of hemorrhaging during the ER or pediatrician visits on August 7 and August 9, 2011. Both parents and the witnesses denied any accident or a trauma within the ten days preceding the child's August 11 seizure. C.F. was seen appearing well in the morning and early afternoon of August 11 and then, suffered a seizure and serious hemorrhaging in

the evening. During this time, Fraker was the only person with the child. Therefore, there is no support in the record for an argument that a defense medical expert would have changed the jury's finding that Fraker was reckless in creating a substantial risk to the health and safety of C.F. by violating the duty of care, protection, or support, or the finding that Fraker was reckless in abusing the child.

**{¶55}** Considering the totality of the circumstances, we cannot say that the trial counsel's failure to obtain a medical expert refuting a finding of a shaken baby syndrome prejudiced Fraker "to such a degree as to make the outcome of the trial unreliable." *See State v. Frazier*, 61 Ohio St.3d 247, 254, 574 N.E.2d 483, 489 (1991).

*(2) Failure to Proffer Substantial Testimony and Records of Stevenson's Drug Counseling*

**{¶56}** Appellant is incorrect in his assertion that the trial counsel's performance fell below an objective standard of reasonable representation because he "failed to proffer" Stevenson's counseling records or her counselor's testimony and failed to "even encourage the trial court to consider an in-camera examination of these records." (*See* App't Br. at 21.) The record before us discloses that the trial counsel subpoenaed counselors from Consolidated Care Counseling Center together with Stevenson's records of treatment. When the facility refused to disclose the confidential information, the trial counsel filed motions to enforce the subpoenas, and participated in an oral hearing to argue the relevance of the

counseling records and the testimony. Nevertheless, in the absence of Stevenson's consent to the disclosure, the trial court found that the federal law did not permit for even an in camera investigation of the records in the circumstances presented by this case. Under the highly deferential standard, we cannot agree that trial counsel acted unreasonably when it did not further "follow-up with his determination that Angelica Stevenson's counseling records and testimony from her counselor, Chad Routon, were relevant to Appellant's case." (*See* App't Br. at 21.)

**{¶57}** Similarly, an assertion that Stevenson's counseling records or her counselor's testimony would have had a material effect on the result of the trial is speculative. The only indication that those records and testimony would have provided evidence of jeopardizing the child by Stevenson comes from the trial counsel's unsupported allegations. The argument advanced by Appellant that the counseling records and testimony "would have shown much more, such as an admission that Angel had shaken the minor child or that Angel had thoughts of harming her child" is, again, mere speculation. (*See* App't Br. at 21.) Indeed, there is nothing in the record that would point towards abuse of C.F. by Stevenson or towards any evidence of such abuse in her counseling records.

**{¶58}** Because there is no evidence that Fraker was prejudiced by the absence of Stevenson's counseling records and because his trial counsel's

performance in this respect was not deficient, he was not deprived an effective assistance of counsel.

*(3) Failure to Object to Leading Questioning and (4) Failure to Object To Questioning that Suggested Coerced Testimony on the Part of the Defense*

**{¶59}** Fraker's trial counsel was not ineffective by failing to object. "[F]ailure to object to error, alone, is not enough to sustain a claim of ineffective assistance." *State v. Campbell*, 69 Ohio St.3d 38, 52-53, 630 N.E.2d 339 (1994), quoting *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988). "Because 'objections tend to disrupt the flow of a trial, and are considered technical and bothersome by the fact-finder,' competent counsel may reasonably hesitate to object in the jury's presence." (Alterations omitted.) *Id.* at 53, quoting Jacobs, Ohio Evidence (1989), at iii-iv. Furthermore, the trial court has discretion to allow leading questioning and therefore, "failure to object to any leading questions [does not constitute] ineffective assistance of counsel." *State v. Jackson*, 92 Ohio St.3d 436, 2001-Ohio-1266, 751 N.E.2d 946, ¶ 34, citing Staff Note, Evid.R. 611(C) and *State v. D'Ambrosio*, 67 Ohio St.3d 185, 190, 616 N.E.2d 909 (1993). Therefore, Fraker's trial counsel was not ineffective by failing to object to State's leading questions throughout the trial.

**{¶60}** Fraker contends that his trial counsel was ineffective when he failed to object to State's questions and statements about the witnesses having dinner together prior to trial and discussing their respective testimony, and to the State's

-34-

requests for defense counsel's notes allegedly made during those meetings. First, as stated above, because objections tend to disrupt the flow of the trial, the trial counsel's failure to object, alone, is not sufficient to rebut the presumption of a reasonable trial strategy. Some of the witnesses did have dinner together and discussed their respective testimonies, with the trial counsel. As such, the questioning was proper to impeach their testimony under Evid.R. 607. Second, Fraker does not provide any support for a claim that he was prejudiced, i.e., that objections to these questions and discovery requests by the State would have resulted in his acquittal.

{¶61} None of the claimed errors by the trial counsel "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *See Walker*, 90 Ohio App.3d at 359. Accordingly, Appellant's first assignment of error is overruled.

### Second Assignment of Error

**The record contained insufficient evidence to support a conviction for endangering children in violation of O.R.C. § 2919.22(A), and O.R.C. § 2919.22(B)(1).**

{¶62} Fraker argues that he was denied due process because the record contained insufficient evidence to support a finding that C.F. suffered from shaken baby syndrome and therefore, the jury could not have found him guilty of child endangering. (App't Br. at 22-23.) When reviewing a criminal case for the

sufficiency of the evidence, "our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence submitted at trial, if believed, could reasonably support a finding of guilt beyond a reasonable doubt." *In re Willcox*, 3d Dist. Hancock No. 5-11-08, 2011-Ohio-3896, ¶ 10, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). We look at the evidence in the light "most favorable to the prosecution" and will affirm the conviction if "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118. Importantly, this test raises a question of law and does not allow us to weigh the evidence. *In re Willcox* at ¶ 10.

{¶63} Fraker was convicted of endangering children in violation of R.C. 2919.22(A) (Count II), and R.C. 2919.22(B)(1) (Count III). In order to support the sufficiency of Count II, subsection (A) of R.C. 2919.22 required the prosecutor to prove beyond a reasonable doubt that (1) Fraker was "the parent, guardian, custodian, person having custody or control, or person in loco parentis"; (2) "of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age"; (3) and that Fraker created "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2919.22. Fraker does not dispute the first two elements. Looking at the record in the light most favorable to the prosecution, we find sufficient

evidence to establish that a reasonable jury could believe that C.F. suffered his injuries in the afternoon of August 11, prior to Stevenson's return to the apartment, during which time Fraker was the only person with the child. Accordingly, the jury could find he violated the duty of care, protection, or support and created a substantial risk to the child's health or safety.

{¶64} For sufficiency of Count III, subsection (B)(1) of R.C. 2919.22 required proof that Fraker abused a child who was "under eighteen years of age or [was] a mentally or physically handicapped child under twenty-one years of age." *Id.* The prosecution presented evidence that C.F. suffered injuries that could only have been caused by a very serious accident, such as "head run over by a car," "child falling out of a window that's several stories high," or by an "acceleration/deceleration mechanism or a shaking mechanism." (Trial Tr. vol. 2 at 82.) The record further reflects that C.F. did not have his head run over by a car, did not fall out a window, and was not a victim of any serious accident of similar extent in the ten days preceding his seizure. C.F. appeared fine earlier in the day on August 11, but exhibited a seizure and serious hemorrhaging immediately after several hours spent with Fraker alone. Under the standard for sufficiency, if the jury believed the evidence presented, it could reasonably have found that Fraker recklessly abused his minor child. Appellant's second assignment of error is overruled.

**Third Assignment of Error**

**The conviction for endangering children in violation of O.R.C. § 2919.22(A), and O.R.C. § 2919.22(B)(1) was contrary to the manifest weight of evidence.**

{¶65} In the third and final assignment of error, Fraker asserts that his conviction was against the manifest weight of the evidence.  In his contention, the evidence illustrated that C.F. "was suffering from medical issues long before the August 11, 2011 date" and therefore, the jury could not determine when the harm to the child occurred and that Fraker was the one who caused the harm.  (App't Br. at 24-25.)

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*"

(Emphasis sic.)  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶66} When reviewing a conviction challenged for the manifest weight of the evidence the appellate court acts as a "thirteenth juror" and may disagree with the jury's resolution of the conflicting testimony.  *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).  Therefore, Fraker will succeed if we find that "in resolving conflicts in the evidence, the jury clearly lost

its way and created such a manifest miscarriage of justice that the conviction must

be reversed and a new trial ordered." *Id.*, quoting *State v. Martin*, 20 Ohio App.3d

172, 175, 485 N.E.2d 717 (1st Dist.1983). However, we give due deference to the

findings of the jury, because

> [t]he fact-finder occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness's reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.

(Alteration omitted.) *State v. Dailey*, 3d Dist. Crawford, No. 3-07-23, 2008-Ohio-

274, ¶ 7, quoting *State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456

(1998).

{¶67} Fraker argues that there could have been alternative causes of C.F.'s

injuries, apart from the child abuse. He further asserts that multiple people had

access to C.F. and could have "shaken" the child. Nevertheless, the testimony was

mostly undisputed in that C.F. exhibited no symptoms of hemorrhaging or any

kind of distress in the morning and early afternoon of August 11, 2011. No such

symptoms were discovered at his medical visits on August 7 and August 9, 2011.

Although there was some dispute in the witnesses' testimony regarding whether

Stevenson was inside or outside of the apartment at the moment C.F. turned

"limp," it was uncontroverted that Fraker was alone with the child up until the

point immediately preceding the incident. The "medical issues" that the child exhibited prior to August 11, 2011 concerned mostly spitting up, reflux, bruising, and his feet or hands turning blue. Some people testified to observing "redness" in C.F.'s eyes. None of those symptoms exclude the jury's finding that Fraker created a substantial risk to the health or safety of C.F., or recklessly abused C.F.

**{¶68}** Thus, the evidence does not weigh heavily against the conviction and our review of the record does not establish that the jury lost its way in finding that Fraker recklessly created the substantial risk to C.F.'s health or safety and that he recklessly abused the child. Appellant's third assignment of error is therefore overruled.

**{¶69}** Having found no error prejudicial to Appellant in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**PRESTON, P.J. and ROGERS, J., concur.**

**/jlr**