[Cite as *State v. Stairhime*, 2014-Ohio-1791.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                    CASE NO.  4-13-06

    v.

JERRY L. STAIRHIME,                      O P I N I O N

    DEFENDANT-APPELLANT.

---

Appeal from Defiance County Common Pleas Court
Trial Court No. 13-CR-11590

**Judgment Affirmed**

Date of Decision:   April 28, 2014

---

APPEARANCES:

    *W. Alex Smith* **for Appellant**

    *Russell R. Herman* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant Jerry L. Stairhime ("Stairhime") appeals the May 14, 2013 judgment of the Defiance County Common Pleas Court sentencing Stairhime to an aggregate prison term of 62 years after a jury trial in which Stairhime was convicted of three counts of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), all felonies of the third degree, one count of Sexual Imposition in violation of R.C. 2907.06(A)(4), a misdemeanor of the third degree, and six counts of Rape in violation of R.C. 2907.02(A)(1)(b), all felonies of the first degree.

{¶2} The facts relevant to this appeal are as follows. On January 24, 2013, Stairhime was indicted in a ten count indictment alleging various sexual crimes against multiple victims. (Doc. 1). Count 1 alleged that Stairhime committed Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree, by having sexual contact with victim "A.L.P." when A.L.P. was under 13 years of age. (*Id.*) Count 2 alleged that Stairhime committed Sexual Imposition, in violation of R.C. 2907.06(A)(4), a misdemeanor of the third degree, by having sexual contact with victim "E.K.S" when Stairhime was older than eighteen and E.K.S. was older than thirteen but younger than sixteen. (*Id.*) Counts 3 and 5 alleged that Stairhime committed Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), felonies of the third degree, by causing victims "S.B." and

"A.P.S." to have sexual contact with each other. (*Id.*) Count 4 alleged that Stairhime committed Rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree, by engaging in sexual conduct with S.B. who was less than thirteen years of age at the time. (*Id.*) Counts 6 through 10 alleged that Stairhime committed Rape in violation of R.C. 2907.02(A)(1)(b), all felonies of the first degree, by engaging in sexual conduct with A.P.S., his natural daughter, who was less than thirteen years of age at the time. (*Id.*)

{¶3} On January 28, 2013, Stairhime was arraigned and pled not guilty to the charges against him. (Doc. 7).

{¶4} After a request from the defense, on March 18, 2013, the State filed a Bill of Particulars, more specifically identifying the nature of the crimes and the dates that they allegedly occurred. (Doc. 12).

{¶5} The case proceeded to a jury trial on April 24-25, 2013. At trial, the State called eight witnesses in its case-in-chief, including the victims of the various counts in the indictment. Stairhime called eight witnesses on his own behalf, who collectively testified to his good character and, additionally, that they had never seen Stairhime have any inappropriate sexual contact with anyone. The State then called one rebuttal witness. At the conclusion of the testimony, the case was submitted to the jury. The jury found Stairhime guilty of all ten counts in the indictment.

{¶6} On May 1, 2013, a sentencing hearing was held. At the hearing the State recommended an aggregate prison term of 58 years. Defense counsel made a brief statement in mitigation, then Stairhime made a statement as well. Subsequently the court proceeded to sentence Stairhime. Stairhime was sentenced to four years imprisonment on Count 1, Gross Sexual Imposition, 60 days incarceration on Count 2, Sexual Imposition, to be served concurrently to all other prison terms, four years of imprisonment on Count 3, Gross Sexual Imposition of S.B., nine years imprisonment on Count 4, Rape of S.B., four years imprisonment on Count 5, Gross Sexual Imposition of A.P.S., and nine years imprisonment each on Counts 6-10, Rapes of A.P.S. (Doc. 52). The prison terms in Counts 1, 4, and 6-10 were ordered to be served consecutively to each other for a total of 58 years. (*Id.*) The prison terms in Counts 3 and 5 were ordered to be served concurrent to each other, but consecutive to the other prison terms for an aggregate prison sentence of 62 years. (*Id.*) In addition, at the hearing, Stairhime was notified of his status as a sex offender. (*Id.*) A judgment entry reflecting Stairhime's sentence was filed May 14, 2013. (*Id.*)

{¶7} It is from this judgment that Stairhime appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE JURY ERRED WHEN IT FOUND JERRY STAIRHIME**
**GUILTY OF COUNT 1 OF THE INDICTMENT, GROSS**

**SEXUAL IMPOSITION OF [A.L.P.], AGAINST THE WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR 2**
**THE JURY ERRED WHEN IT FOUND JERRY STAIRHIME GUILTY OF COUNT 2 OF THE INDICTMENT, SEXUAL IMPOSITION OF [E.K.S.], AGAINST THE WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR 3**
**THE JURY ERRED WHEN IT FOUND JERRY STAIRHIME GUILTY OF COUNT[S] 3 AND 4 OF THE INDICTMENT, GROSS SEXUAL IMPOSITION AND RAPE OF [S.B.], AGAINST THE WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR 4**
**THE JURY ERRED WHEN IT FOUND JERRY STAIRHIME GUILTY OF COUNT 5 OF THE INDICTMENT, GROSS SEXUAL IMPOSITION OF [A.P.S.] AS WELL AS COUNTS 6 THROUGH 10 OF THE INDICTMENT OF RAPE OF [A.P.S.], AGAINST THE WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR 5**
**IAN WEBBER [SIC] PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL TO MR. STAIRHIME AS SET FORTH BY THE UNITED STATES SUPREME COURT.**

**ASSIGNMENT OF ERROR 6**
**MR. STAIRHIME'S SENTENCE OF CONSECUTIVE PRISON TERMS ON ALL FELONY COUNTS WAS NOT CONSISTENT WITH THE REQUIREMENTS UNDER ORC 2929.11, 2929.14 AND 2929.41.**

**{¶8}** As the first four assignments of error all deal with a discussion of the evidence, which in some parts is interrelated, we elect to address these assignments of error together.

*First, Second, Third, and Fourth Assignments of Error*

**{¶9}** In Stairhime's first, second, third, and fourth assignments of error, he argues that his convictions were against the manifest weight of the evidence. Specifically, Stairhime contends that there was no physical evidence to convict him of the charges, only the testimony of the victims, and that there were "clear issues" with the victims' credibility.

**{¶10}** In reviewing whether a verdict was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "To 'reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required.'" *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, ¶ 38, quoting *Thompkins*, paragraph four of the syllabus.

Case No. 4-13-06

{¶11} In this case, Stairhime was charged with three counts of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), which reads as follows:

> **(A)  No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:**
>
> **\* \* \***
>
> **(4)   The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person**

{¶12} Stairhime was charged with one count of Sexual Imposition, in violation of R.C. 2907.06(A)(4), which reads as follows:

> **(A)  No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:**
>
> **\* \* \***
>
> **(4)   The other person, or one of the other persons, is thirteen years of age or older but less than sixteen years of age, whether or not the offender knows the age of such person, and the offender is at least eighteen years of age and four or more years older than such other person.**

{¶13} Stairhime was charged with six counts of Rape, in violation of R.C. 2907.02(A)(1)(b), which reads as follows:

> **(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the**

> **offender but is living separate and apart from the offender, when any of the following applies:**
>
> **\* \* \***
>
> **(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.**

{¶14} The following pertinent evidence was presented at trial. A.L.P. was the first victim to testify. A.L.P. testified that she was eleven years old in December of 1996 and at that time Stairhime was married to her mother. (Tr. at 151). According to A.L.P., the day after Christmas on December 26, 1996, A.L.P. was watching the movie Independence Day with Stairhime when she fell asleep on his lap. (Tr. at 156). When she awoke she got up to go to the bathroom. (*Id.*) A.L.P. testified that at that time Stairhime came into her bedroom crying and said he had touched her "down there," that he was sorry for it, and begged her not to tell anyone. (Tr. at 156). In addition, Stairhime said "it would never happen again" and specifically "begged [A.L.P.] not to tell [her] mom." (*Id.*) This incident led to Gross Sexual Imposition charge in Count 1.

{¶15} A.L.P. also testified that there were "several times" where Stairhime would come into her room at night when she was sleeping, and that she would wake up with Stairhime's hand on her "inner thigh up towards [her] personal space." (Tr. at 157). In addition, A.L.P. testified that one night Stairhime walked

into her room "completely naked, turned on the light and went and sat in a chair and then got up and finally left." (*Id*.)

{¶16} A.L.P. testified that she told her mother about the incidents but her mother did not believe her. (Tr. at 160). Years later, A.L.P. reported the incident and spoke with Officer Laura Szabo, who also testified at trial. (Tr. at 136). Officer Szabo testified that she talked with A.L.P, her mother, and Stairhime. Officer Szabo testified that Stairhime stated with regard to the incident on December 26, 1996, that he had placed his hand on A.L.P.'s abdomen, and that he should not have said anything to her about it. (Tr. at 139). Officer Szabo testified that she referred the investigation to children services, and that the investigation came back "unsubstantiated." (Tr. at 144).

{¶17} E.K.S. was the next victim to testify at trial. E.K.S. testified that she was fifteen years old in early 2007 and that at that time Stairhime was her mother's husband.[1] (Tr. at 169). E.K.S. testified that Stairhime would make comments to her that made her uncomfortable, comments about her "breasts" and "[h]ow they were at [her] age * * * and about [her] butt." (Tr. at 171).

{¶18} E.K.S. testified to a specific incident occurring in the months prior to June 2007 wherein she was sleeping and woke up to Stairhime "caressing [her] inner thigh and working his way towards [her] vaginal area. At that point [she]

---

[1] E.K.S. and A.L.P were not related. Stairhime was married to multiple different women through the course of these allegations, and E.K.S. and A.L.P. were the daughters of two of those women.

didn't say anything, [she] just rolled over to move away from him and [she] continued not to say anything or move further." (Tr. at 172). E.K.S. testified that Stairhime touched her "vaginal area" but that there was no penetration. (*Id*.) This incident led to the filing of Count 2 in the indictment, Sexual Imposition.

{¶19} E.K.S. testified that she told her boyfriend and her cousin what happened, and that she also told her mother, but only after E.K.S.'s boyfriend had told her mother. (Tr. at 173) E.K.S. testified that Stairhime's comments and the physical contact stopped after her mother had spoken with him. (Tr. at 174).

{¶20} E.K.S.'s then-boyfriend-now-husband testified at trial. He testified that he observed Stairhime nonchalantly brush E.K.S.'s leg and her upper thigh in what he felt was an inappropriate manner. (Tr. at 188). He further testified that E.K.S. told him at the time about Stairhime having sexual contact with E.K.S. (Tr. at 188).

{¶21} S.B. was the next victim to testify at trial. S.B. testified that she was eleven years old in January/February of 2006, and that in that time period she spent the night at Stairhime's residence because she was friends with Stairhime's daughter, victim A.P.S. (Tr. at 200, 205). S.B. testified that while at the residence, S.B. and A.P.S. were sitting on Stairhime's lap because Stairhime was going to show S.B. and A.P.S. how to check for breast cancer. (Tr. at 202). S.B. testified that Stairhime directed S.B. and A.P.S. to put their hands down their tank

tops and check for lumps, then had the girls do it to each other in front of him. (*Id.*)

**{¶22}** A.P.S. testified that she remembered sitting on Stairhime's lap with S.B. and Stairhime directing A.P.S. and S.B. to check themselves for breast cancer. (Tr. at 280). However, A.P.S. testified she did not recall them touching each other. (Tr. at 280). This incident led to the filing of the Gross Sexual Imposition charges in Counts 3 and 5 of the indictment.

**{¶23}** S.B. testified that later on the same night that she stayed with A.P.S. at Stairhime's residence, Stairhime called S.B. into his bedroom after A.P.S. had fallen asleep. According to S.B., she engaged in small-talk with Stairhime, and then eventually said she was getting tired so she went back out to the living room to lay down with A.P.S. (Tr. at 202). S.B. testified that sometime later, Stairhime again said her name and asked if she was still awake. (*Id.*) Stairhime then asked S.B. to come back into the bedroom to talk to him. (*Id.*) S.B. testified that this routine happened about "three times" until the last time Stairhime asked S.B. to "watch T.V. with him." (*Id.* at 204). S.B. testified that she did, and fell asleep. (*Id.*) S.B. testified that she woke with Stairhime's hand down her pants "touching the top of [her] vagina." (Tr. at 204).

**{¶24}** S.B. testified that she asked Stairhime to take his hand out and he did. (Tr. at 205). She testified that Stairhime later ended up putting his hand back

down her pants and then "put his fingers into [her]." (Tr. at 205). S.B. testified that she told Stairhime to stop, and that Stairhime then climbed on top of her and put his "penis inside [her]." (*Id.*) S.B. testified that she told Stairhime she "was going to throw up and that [she] needed * * * to go to his restroom." (Tr. at 205). S. B. testified that Stairhime then let her go. (*Id.* at 206). S.B. testified that after she got sick, Stairhime directed S.B. to sleep in his bed, and that Stairhime went and slept in the living room with A.P.S. (*Id.*) A.P.S. corroborated this part of the story, testifying that when she woke the next morning, S.B. was asleep in Stairhime's bed and Stairhime was asleep beside her. (Tr. at 281). This incident led to the filing of the Rape charge in Count 4 of the indictment.

{¶25} S.B. testified that she talked to A.P.S. on the school bus on the next school day and asked A.P.S. if anything had ever happened between A.P.S. and her father. (Tr. at 207). S.B. testified that A.P.S. got really scared and * * * wouldn't look at [her] in the face." (*Id.*) S.B. testified that A.P.S. asked to get out of her seat and that they stopped being friends after the incident. (*Id.*)

{¶26} Regarding the incident on the bus, A.P.S. testified that S.B. asked her if her father had ever "molested" her and A.P.S. told her "no" at the time. (Tr. at 282). A.P.S. testified that she was "in denial about it" and "did not want to believe that it happened" so she stopped being friends with S.B. (Tr. at 283).

{¶27} The conversation was overheard by S.B.'s cousin on the bus, who told the school principal. (Tr. at 208). S.B. testified the principal called her down to the office. (*Id.*) S.B. testified that she had to tell her parents, Job and Family Services and the principal about the incident. (Tr. at 208). S.B. testified that she eventually told them all that the accusations were not true because she "was scared" and that it "ruined [her] life." (*Id.* at 209). S.B. testified that she was constantly at "Family and Job Services * * * over [her] whole summer." (*Id.*) She testified that she just "wanted it all to be over with," that she did not want to be in the middle of it any longer, and that she "didn't want it to be drawn out" or to "get anyone in trouble." (*Id.* at 209, 224).

{¶28} A.P.S., Stairhime's natural daughter, was the next victim to testify at trial. A.P.S. testified that when she was 11-12 years old, between February of 2005 and May of 2006, Stairhime made her perform oral sex on him 2-3 times.[2] (Tr. at 276). In addition, A.P.S. testified that Stairhime performed oral sex on her 5-6 times. (Tr. at 278). A.P.S. testified that Stairhime "would attempt in some way to make a game out of it." (Tr. at 277). According to A.P.S., Stairhime would "bet [her] ten bucks * * * for the next five minutes [she] can't lay still" while Stairhime got "to do whatever [he] want[ed]." (Tr. at 277). A.P.S. would later clarify that at least three separate times Stairhime performed oral sex on her

---

[2] During this time period, the record reflects that A.P.S. lived with her mother and only visited Stairhime every other weekend.

and at least twice Stairhime made A.P.S. perform oral sex on him. (Tr. at 312). These incidents led to the Rape charges in Counts 6-10 of the indictment. A.P.S. testified that the sexual contact with her father stopped when S.B. came forward. (Tr. at 281).

{¶29} The State also called E.K.S.'s mother to testify at trial. She testified that Stairhime had told her that A.P.S. was a Stairhime and that "Stairhime's do things the right way, the correct way or they don't do them at all." (Tr. at 231). So Stairhime "made sure that [A.P.S.] knew how to correctly perform oral sex." (Tr. at 231). E.K.S.'s mother also testified that Stairhime made comments that he "had fantasized of having sex and is [sic] part of a threesome" with either victims E.K.S. or A.P.S. (*Id.*) In addition, E.K.S.'s mother testified that Stairhime had told her "things he had done" to his previous wife's daughter, victim A.L.P. (Tr. at 232).

{¶30} Stairhime called eight witnesses on his behalf. He called his current fiancé, Misty Peconge, who testified that Stairhime was "awesome" and that she had never seen Stairhime do anything inappropriate. (Tr. at 361-362). Peconge also testified that A.P.S. had lived with her and Stairhime for a little over three months. (Tr. at 363). Peconge testified that in her opinion A.P.S. was a liar, that A.P.S. was jealous of her children, and that A.P.S. had made up the allegations to

get back at Stairhime after Stairhime made up a story that he had won money in the lottery and was going to share some with A.P.S. (Tr. at 365-367).

{¶31} Peconge's daughters, Dakota and Olivia, both testified at trial that they had been around Stairhime, that Stairhime was a good person and that he had never done anything inappropriate. (Tr. at 333, 343). Dakota also testified that A.P.S. was a liar and that she "uses people." (Tr. at 337). Multiple friends of Peconge's daughters testified, stating that Stairhime never made any sexual advances or inappropriate comments. (Tr. at 318, 325, 330). One of the girls testified that A.P.S. was "two-faced" and "manipulative." (Tr. at 320).

{¶32} On appeal, Stairhime argues that all ten of his convictions were against the manifest weight of the evidence. He contends that for all of the crimes, there was no physical evidence found, and that there were no witnesses to the alleged incidents other than the victims. He also contends that there were credibility issues with A.P.S., S.B., and A.L.P.

{¶33} Six of Stairhime's ten convictions were for crimes he perpetrated against his daughter, A.P.S. These convictions included five counts of Rape and one count of Gross Sexual Imposition. The five Rape counts were for three instances where Stairhime performed oral sex on A.P.S. when she was under the age of 13, and two instances where Stairhime had A.P.S. perform oral sex on him. Stairhime contends that A.P.S. fabricated her testimony to get back at him.

Testimony was presented at trial that Stairhime had told A.P.S. that he had won money in the lottery and that some of it would be shared with A.P.S. Stairhime contends that it was only after he revealed to A.P.S. that the lottery story was a joke, and after he got in a fight with A.P.S., that A.P.S. came forward and reported the sexual conduct.

{¶34} Notwithstanding Stairhime's arguments, A.P.S. took the stand and testified to a period of her life where Stairhime repeatedly abused her sexually. According to A.P.S. that period of abuse ended when another victim came forward and reported Stairhime. The jury was able to see and hear A.P.S.'s testimony and found her to be credible despite the evidence of Stairhime jokingly telling A.P.S. he had won money in the lottery that he was going to share with A.P.S. A.P.S. clearly testified that there were *at least* two times Stairhime made her perform oral sex on him, and *at least* three times he performed oral sex on her. Under these circumstances, we cannot find that Stairhime's five convictions for Rape against A.P.S. are against the manifest weight of the evidence.

{¶35} Stairhime was also convicted of one count of Gross Sexual Imposition against A.P.S., and one count against S.B., for the incident wherein S.B. and A.P.S. sat on his lap when they were both under 13 and Stairhime directed them to check themselves for breast cancer. S.B. specifically testified that she recalled Stairhime directing them to touch each other's breasts. A.P.S.

testified that she recalled Stairhime directing them to check themselves for lumps, but she did not recall them touching each other's breasts; however, A.P.S. testified that at that point in her life, some of the oral sex incidents with Stairhime had already occurred, so the incident might not have stuck out in her mind as much as it would have in S.B.'s.

{¶36} Stairhime contends that there was no physical evidence of any of these crimes, and that each of the witnesses' credibility was called into question. Stairhime contends that since S.B. reported the incident and then later recanted, her testimony was not credible. However, S.B. explained why she recanted her earlier statement, and the jury was free to judge her credibility. Under these circumstances, we cannot find that these two Gross Sexual Imposition convictions involving sexual contact with S.B. and A.P.S. were against the manifest weight of the evidence.

{¶37} Stairhime was also convicted of Rape of S.B., for the incident occurring later on the same night of the Gross Sexual Imposition incident. After reviewing the evidence presented, we similarly cannot find this conviction was against the manifest weight of the evidence. S.B. clearly testified to an incident where Stairhime repeatedly called her into his room until she was tired enough to fall asleep, at which time Stairhime began to touch S.B., then escalated the incident to digital penetration, then sexual intercourse. S.B.'s story that she ended

the sexual intercourse when she felt ill seemed to be corroborated by A.P.S.'s testimony that when she woke the next morning, S.B. was asleep in Stairhime's bed and Stairhime was asleep beside A.P.S. Under these circumstances, we cannot find that Stairhime's conviction of Rape of S.B. was against the manifest weight of the evidence.

{¶38} Stairhime was also convicted of the misdemeanor Sexual Imposition against E.K.S. E.K.S. testified to an incident wherein she woke to Stairhime touching the top of her vagina, though there was no penetration. Similar to S.B.'s story, Stairhime waited until E.K.S. was sleeping and then proceeded to have sexual contact with her. Stairhime's only argument on appeal to counter his conviction against E.K.S. is that there was no physical evidence. However, despite the lack of physical evidence, the victim's testimony is more than adequate to sustain a conviction. Under these circumstances, we cannot find that Stairhime's conviction for Sexual Imposition of E.K.S. was against the manifest weight of the evidence.

{¶39} Stairhime's remaining conviction was for Gross Sexual Imposition against victim A.L.P. Stairhime confessed to A.L.P. that he touched her "down there" while she was sleeping. However, A.L.P. testified that she was not actually awake at the time or aware of that touching. Nevertheless, there is significant corroboration of Stairhime's confession in this record. First, Stairhime also

confessed this incident to a separate witness, albeit years later, E.K.S.'s mother. According to E.K.S.'s mother, who was married to Stairhime, Stairhime told her that he had done "things" with his previous wife's daughter, A.L.P. In addition to Stairhime's separate confession, his purportedly confessed acts were highly consistent with other behavior he had exhibited with A.L.P. A.L.P. had awakened on other occasions with Stairhime touching her inner thigh. Moreover, Stairhime's confessed actions were also strikingly consistent to incidents with other victims, notably S.B. and E.K.S., who testified that Stairhime targeted them while they were sleeping and began touching them in a similar manner. In fact, it was S.B. who testified that Stairhime had repeatedly worked to get her to come and watch TV with him until she finally fell asleep next to him—a pattern that clearly fits the modus operandi for Stairhime's conduct for almost all of the victims. Thus, under these multiple circumstances, all highly corroborative of Stairhime's confession, we cannot find Stairhime's conviction for Gross Sexual Imposition of A.L.P. was against the manifest weight of the evidence.

{¶40} Accordingly, upon finding that all ten of Stairhime's convictions were not against the manifest weight of the evidence, Stairhime's first, second, third, and fourth assignments of error are overruled.

*Fifth Assignment of Error*

**{¶41}** In Stairhime's fifth assignment of error, he argues that he was provided with ineffective assistance of counsel. "Reversal of convictions on ineffective assistance requires the defendant to show 'first that counsel's performance was deficient and, second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.'" *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751 at ¶105, quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052 (1984). When considering a claim of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

**{¶42}** A tactical decision by trial counsel, who as a licensed attorney is presumed to be competent, is not by itself enough to show ineffective assistance of counsel simply because the strategy did not result in an acquittal. *State v. Clayton*, 62 Ohio St.2d 45, 48-49 (1980); *State v. Timm*, 3d Dist. Seneca No. 13-11-23, 2012-Ohio-410, ¶ 31. "Furthermore, trial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance." *State v. Turks*, 3d. Dist. Allen No. 1-08-44, 2009-Ohio-1837, ¶ 43, citing *State v. McKinney*, 11th Dist. Trumbull No. 2007-T-0004, 2008-Ohio-3256, ¶ 191; *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 103.

{¶43} On appeal, Stairhime first contends that his counsel was ineffective for "not fully discuss[ing] with the defendant the ramifications of proceeding with the trial after the State made a motion to amend the indictments and bills of information under Criminal Rule 7(D)." (Appt's Br. at 10). In this case, on the second day of trial, the State moved to amend the indictment and the bill of particulars to comport with the dates of the incidents as testified to by various witnesses. No changes were made to the names of the offenses or the elements to be proved, only the dates alleged were amended. Stairhime's counsel objected to the amendment, but the objection was overruled.

{¶44} Stairhime now claims that he was not fully informed that he "could have had potentially a mistrial and a new jury seated." (Appt.'s Br. at 10). However, Stairhime and his counsel were notified in open court on the record that Stairhime could make a motion for the court to determine whether the changes to the indictment were substantive, and that if they were found to be substantive, Stairhime could have a new jury seated. (Tr. at 262). Stairhime's counsel stated on the record that he discussed the matter with his client, and that they wished to proceed with the jury already selected. (*Id.* at 263). Nevertheless, the court did not rest solely on counsel's representations. It then inquired of Stairhime himself, having the following dialogue.

**THE COURT: All right. Um, Mr. Stairhime you understand what your lawyer is saying on your behalf there?**

**THE DEFENDANT: Yes, sir.**

**THE COURT: That rule provides at a minimum you would have the opportunity to make a motion for the Court to continue or delay this with the same jury, or request that this jury be discharged and a new jury impaneled at a later date. Your lawyer says on your behalf that it's your decision to go forward today on the amended indictment with this jury?**

**THE DEFENDANT: Yes, Sir. I wish to continue. Yes, Your Honor, I wish to continue.**

(Tr. at 263).

{¶45} Based on the foregoing dialogue, we cannot find that trial counsel was, in any manner, ineffective where Stairhime was clearly addressed, informed of the issue, stated that he understood and that he wished to continue with the trial. There is simply nothing in the record to contradict Stairhime's direct acknowledgement that he understood and wished to proceed. Thus, Stairhime's argument is not well-taken.

{¶46} Stairhime next argues that his trial counsel was ineffective for failing to object to leading questions used by the State throughout the trial. Evidence Rule 611(C) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." This broad exception places the decision of whether to allow leading questions within the sound discretion of the trial court. *State v. Jackson,* 92 Ohio St.3d 436, 449 (2001); *State v. Jefferson*, 2d Dist. Greene No. 2002 CA 26, 2002-Ohio-6377,

¶ 9. As a result, the Ohio Supreme Court has held that the failure to object to leading questions does not constitute ineffective assistance of counsel. *Jackson, supra,* at 449; *State v. Fraker*, 3d Dist. Union No. 14-12-19, 2013-Ohio-4561, ¶ 59. Thus we cannot find that any failure to object to any leading questions would rise to the level of ineffective assistance of counsel.

{¶47} Finally, Stairhime contends that "there were numerous questions he believed should have been asked and additional investigations done by counsel." (Appt's Br. at 12). Stairhime's cites nothing in the record to support his argument and he directs us to no law showing how his counsel would be ineffective for failing to bring arguments Stairhime does not even mention and are plainly not supported or further elaborated in the record. Thus this argument is not well taken.

{¶48} Accordingly, Stairhime's fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶49} In Stairhime's sixth assignment of error, he contends that his sentence was not consistent with the requirements of R.C. 2929.11, R.C. 2929.14, and R.C. 2929.41. Stairhime argues generally that his aggregate prison sentence of 62 years was excessive as he had no prior felonies and does not have an extensive criminal history.

{¶50} "A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record; the sentencing statutes' procedure was not followed or there was not a sufficient basis for the imposition of a prison term; or that the sentence is contrary to law." *State v. Upkins*, 3d Dist. Shelby No. 17-13-02, 2013-Ohio-3986, ¶ 8, citing *State v. Ramos,* 3d Dist. Defiance No. 4-06-24, 2007-Ohio-767, ¶ 23 (the clear and convincing evidence standard of review set forth under R.C. 2953.08(G)(2) remains viable with respect to those cases appealed under the applicable provisions of R.C. 2953.08(A), (B), and (C) * * *). Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus. An appellate court should not, however, substitute its judgment for that of the trial court because the trial court is "'clearly in the better position to judge the defendant's dangerousness and to ascertain the effect of the crimes on the victims.'" *State v. Watkins,* 3d Dist. Auglaize No. 2–04–08, 2004–Ohio–4809, ¶ 16, quoting *State v. Jones,* 93 Ohio St.3d 391, 400 (2001).

{¶51} At the outset, we note that recent amendments to R.C. 2929.14(C)(4) now require a trial court to make additional specific findings before imposing consecutive sentences on an offender. While the trial court is required to make the

specific findings, it is not required to list its reasoning for making the findings. *State v. Hill*, 3d Dist. No. 7-12-11, 2013-Ohio-3873, ¶ 22. "Furthermore, the sentencing court is not required to recite any 'magic' or 'talismanic' words when imposing consecutive sentences." *State v. Bever*, 4th Dist. Washington No. 13CA21, 2014-Ohio-600, ¶ 17, citing *State v. Clay,* 4th Dist. Lawrence No. 1 1CA23, 2013–Ohio–4649, ¶ 64. However, it must be clear from the record that the sentencing court actually made the required statutory findings. *State v. Alexander,* 1st Dist. Hamilton Nos. C-110828, C-110829, 2012-Ohio-3349 ¶ 16. A failure to make the findings required by R.C. 2929.14(C)(4) renders a consecutive sentence contrary to law. *State v. Stamper*, 12th Dist. Butler No. CA2012-08-166, 2013-Ohio-5669, ¶ 23.

**{¶52}** With respect to the consecutive sentence issues raised in this case R.C. 2929.14(C)(4) states,

> **(4)  If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:**
>
> **(a)  The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.**

**(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.**

**(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.**

**{¶53}** Thus, based on the statute, the trial court is required to make three findings before imposing consecutive sentences: 1) that consecutive sentences are necessary to protect the public from the future crime or to punish the offender; 2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and 3) that one of the subsections (a), (b), or (c) apply. *State v. Farnsworth*, 10th Dist. Franklin No. 12CO10, 2013-Ohio-1275, ¶ 8.

**{¶54}** In this case, the trial court stated the following with regard to its imposition of consecutive sentences at the sentencing hearing.

**I think you remain a substantial risk to commit similar acts in the future if you think that you could get away with it under any circumstances. I think you remain a significant risk to the public. I think the harm caused not only to the specific victims but to the, all the other people that have been affected through them, and through the years by your conduct clearly demonstrates that concurrent terms or single terms would not adequately punish your behavior, nor protect the public.**

\* \* \*

> **Prison terms as to each of the Rape offenses will likewise run consecutively with each other. Each of those is a separate and each singly a devastating harmful act and should be separately punished in the court's view by the ongoing pattern of behavior. The likelihood of [Stairhime's] recidivism in light of his lack of any remorse and clear willingness to continue to attempt to manipulate the victims here to avoid responsibility for his conduct.**

(May 1, 2013, Tr. at 13, 15).

{¶55} In the trial court's judgment entry, the trial court stated the following.

> **The Court has considered the history of this cause as known to the Court; the representations of Counsel; victim impact statements; and, appropriate statutory criteria.**
>
> * * *
>
> **The Court has imposed Consecutive terms, finding that said terms are necessary to adequately protect the public and are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, further, the offender's likely hood [sic] of reoffending demonstrates that consecutive sentences are necessary to protect the public from future crime.**
>
> * * *
>
> **Based upon all of the foregoing considerations, the Court finds that the Defendant has engaged in an ongoing pattern of behavior involving multiple victims and there is a substantial risk for future similar violations.**

(Doc. 52).

{¶56} The trial court's discussion at the hearing and in its judgment entry used some, but not all, of the actual language of R.C. 2929.14(C)(4). With regard

to the first finding at the sentencing hearing, the trial court specifically stated that Stairhime was a substantial risk to the public and that he was a substantial risk to recidivate, which we take as a need to protect the public. With regard to the second finding, the court found that the "harm caused * * * through the years by [Stairhime's] conduct * * * demonstrates that concurrent terms or single terms would not adequately punish your behavior, nor protect the public," which we can take to mean that the sentences are not disproportionate. With regard to the third and final finding, the court found that each conviction was for a separate and "devastating harmful act and should be separately punished in the court's view by the *ongoing pattern of behavior*." (Emphasis added.) We take this finding to be an understanding that there are one or more courses of conduct.

{¶57} As the trial court is not required to use "talismanic" words, we find that after analyzing the foregoing language and comparing it to the required findings, the trial court's language is sufficient to substantially comply with R.C. 2929.14(C)(4). *See State v. Temple*, 2d Dist. Clark No. 2012-CA-65, 2013-Ohio-3843, ¶¶ 22-26 (wherein the second district similarly analyzed the trial courts findings to conclude that the required findings of R.C. 2929.14(C)(4) were satisfied); *See also State v. Koeser*, 11th Dist. Portage No. 2013-P-0041, 2013-Ohio-5838, ¶ 27 (wherein the Eleventh District conducted a similar analysis and concluded the required findings were made). We find that the judgment entry

makes similar statements that reflect the required findings of R.C. 2929.14(C)(4). Nevertheless, we would note that although the court is not required to use "talismanic" words, it would be a far better practice—and one which would virtually eliminate a problematic appellate issue and mandatory re-sentencing—for the trial court to clearly specify its findings pursuant to R.C. 2929.14(C)(4) by using the precise language required in the statute.

{¶58} However, as the record illustrates that the trial court made adequate findings to support consecutive sentences and the trial court stated that it had considered the appropriate statutes, we cannot find that the trial court's sentence was excessive or that it was clearly and convincingly contrary to law. Accordingly, Stairhime's sixth assignment of error is overruled.

{¶59} For the foregoing reasons Stairhime's assignments of error are overruled and the judgment of the Defiance County Common Pleas Court is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. concurs.**

**ROGERS, J., concurs; concurs in Judgment Only as to
     Assignment of Error No. 6**

**/jlr**