[Cite as *State v. Summers* , 2014-Ohio-4538.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  10-13-22

      v.

CHRISTOPHER A. SUMMERS,          O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Mercer County Common Pleas Court
Trial Court No. 13 CRM 30

**Judgment Affirmed**

**Date of Decision:   October 14, 2014**

APPEARANCES:

    *J. Allen Wilmes*  for Appellant

    *Matthew K. Fox*  for Appellee

**SHAW, J.**

{¶1} Defendant-appellant Christopher A. Summers ("Summers") appeals the October 22, 2013 judgment of the Mercer County Common Pleas Court sentencing Summers to an aggregate prison term of 20 years after Summers pled guilty to eight counts of Sexual Battery in violation of R.C. 2907.03(A)(7), all felonies of the third degree.

{¶2} The facts relevant to this appeal are as follows. On February 21, 2013 Summers was indicted in a 47 count indictment alleging various counts of Rape, Sexual Battery, Felonious Assault, Gross Sexual Imposition and Attempted Sexual Battery against the same victim. Counts 1 and 11 of the indictment alleged that Summers committed Rape in violation of R.C. 2907.02(A)(2), both felonies of the first degree. Counts 2, 4, 6, 9, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 35, 37, 39, 41, 43 and 45 alleged that Summers committed Sexual Battery in violation of R.C. 2907.03(A)(1), all felonies of the third degree. Counts 3, 5, 7, 10, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 36, 38, 40, 42, 44 alleged that Summers committed Sexual Battery in violation of R.C. 2907.03(A)(7), all felonies of the third degree. Counts 8 and 34 alleged that Summers committed Felonious Assault in violation of R.C. 2903.11(A)(2), both felonies of the second degree. Count 46 alleged that Summers committed Attempted Sexual Battery in violation of R.C. 2923.02(A) and R.C. 2907.03(A)(1), a felony of the fourth degree. Count 47 alleged that

Summers committed Gross Sexual Imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree.

{¶3} On February 27, 2013 Summers was arraigned and pled not guilty to the charges against him. (Doc. 14).

{¶4} On June 17, 2013, the State filed a Bill of Particulars further clarifying the charges against Summers. (Doc. 153). According to the Bill of Particulars the crimes were all perpetrated against the same victim who was a high school student in the accounting class Summers taught, and played for Summers on the girls JV basketball team. The crimes alleged spanned from approximately June of 2010 through October of 2012. (*Id.*)

{¶5} On August 5, 2013, the State filed a *nolle prosequi* as to Counts 1 and 11, Rape, electing not to proceed with those charges. (Doc. 265).

{¶6} The case subsequently proceeded to a jury trial on the remaining counts against Summers. At trial, the victim testified that she first met Summers while she was a high school student at Fort Recovery.[1] (Tr. at 6). Summers was the victim's study hall monitor her freshman year of high school, and he had taught the victim's brothers while they were in school. During the victim's sophomore year of high school, Summers taught her accounting class and he was

---

[1] The record indicates that the trial was in its third day when Summers elected to plead guilty to eight of the Sexual Battery counts against him. The only portion of the trial transcript reproduced on appeal was the testimony of the victim from the third day of trial.

her JV basketball coach. Summers was also a track coach, and the victim ran track.

{¶7} The victim testified that her sophomore year she began occasionally babysitting Summers' kids while Summers and his wife went out. She also testified that she tore her ACL her sophomore year during basketball season, and wanting to continue helping out with the team, she assisted Summers with scouting reports. The victim testified that it was around this time that Summers began to send her text messages and began asking her to come down to see him during study hall. (Tr. at 12).

{¶8} The victim testified that Summers started "meddling" in the personal lives of the players on his team, including hers. (Tr. at 13). She testified that Summers would pull her into the "show choir room" at school to talk and threatened detentions if she would not meet him. (*Id.*) The victim testified that Summers began sending her text messages on the weekends asking her if she was "behaving." (Tr. at 13). The victim testified that Summers would message her about girls in practice and communicate with her about her friends. She testified that Summers was "nosy." (Tr. at 16).

{¶9} The victim testified that in the summer of 2010, a few weeks after school concluded her sophomore year, Summers and his wife asked her to go on a trip to the Outer Banks in North Carolina with them to babysit their children. (Tr.

at 18). The victim testified that despite her reservations regarding Summers, she liked his children and had never seen the ocean so she agreed to go along. (*Id.*)

{¶10} The victim testified that there were multiple incidents on the trip that made her feel uncomfortable but other than a hug nothing physically happened on the trip. (Tr. at 22). The victim testified that Summers sent her a message after the trip apologizing for his demeanor. (*Id.*)

{¶11} The victim testified that later that same summer she went to a basketball camp that Summers also attended. The victim testified that on one evening many of the members of the team were in her room, and that after they left, Summers lingered asking her about her issues with her friends. (Tr. at 24).

{¶12} The victim testified that on June 28, 2010, shortly after the basketball camp was over, she was contacted by Summers' wife to babysit the children for the day. (Tr. at 26). The victim testified that Summers came home while she was still babysitting and told her that he wanted to pay her and that he had to show her something. (Tr. at 26). The victim testified that she followed Summers to his bedroom where Summers shoved her onto the bed. (Tr. at 26). The victim testified that Summers had his hands locked on her arms and that she told Summers to get off of her. (Tr. at 27). The victim testified that Summers told her that he loved her and that she was his "little puzzle piece." (*Id.*)

{¶13} The victim testified that Summers told her he wanted to show her he loved her so he took the victim's clothes off and digitally penetrated her. (Tr. at 27). The victim testified that she "was telling him [she] didn't want it and for him to get off [her] and let [her] go." (Tr. at 27). The victim testified that Summers then put a condom on and had sexual intercourse with her. (Tr. at 29). The victim testified that afterward Summers instructed her not to tell anyone because Summers was in "control and that he could do anything he wanted to [her], and [she] had no idea what kind of man he was and what he was capable of doing to [her] and that he would go to great lengths to make sure that [she] never told." (Tr. at 29-30).

{¶14} The victim testified that Summers then waffled back and forth between telling her that he was "so glad that he got to take [her] virginity and that it meant everything to him, that [she] was so special" to "telling [her] that he could do anything he wanted to [her] and that he made sure that he had the control." (Tr. at 30). After the incident, Summers instructed the victim to get her clothes and go.

{¶15} The victim testified that Summers sent her text messages on her way home after the incident further instructing her not to tell anyone. She testified that she was too scared and embarrassed to tell anyone. She testified that she also felt responsible because she had a feeling she should not have gone over to babysit but went over anyway. (Tr. at 31-32).

**{¶16}** The victim testified that in the days following the incident Summers continued messaging her saying that he wanted to see her and she avoided him as much as she could. (Tr. at 33). The victim testified that she made every excuse she could to put off meeting Summers, but that Summers kept reminding her that she "was under his control and that he had the power and that he was capable of doing anything to keep [her] quiet." (Tr. at 34). The victim testified that at one point after dinner on July 3, 2010, she received 10 messages in a row from Summers, and that Summers then called her and said that she had to "meet him or * * * pay the consequences." (Tr. at 34).

**{¶17}** The victim testified that she met Summers at the "Saint Henry * * * ball diamond" in the first-base dugout following a wedding she was attending. (Tr. at 35). The victim testified that Summers began "kissing [her] and telling [her] how bad he wanted it." (Tr. at 35). The victim testified that Summers pulled her dress up and "went in" then made her perform oral sex on him. (Tr. at 36). The victim testified that after the incident Summers called her to remind her not to tell anyone. (Tr. at 36).

**{¶18}** The victim testified to similar incidents that happened where Summers would tell her how "he needed it" and that "[h]e couldn't keep it under control anymore[.]" The victim testified that Summers made threats to get her to

meet him and that she met him at her sister's house where they had sexual intercourse. (Tr. at 37-38).

{¶19} The victim testified that near the end of July in the summer of 2010 she began dating another high school student and Summers was angry when he found out about it. (Tr. at 40-41). The victim testified that when Summers learned about the victim's boyfriend he told her that she had to meet him so they met out at Dull Road in Mercer County. (Tr. at 41). The victim testified that Summers was screaming at her and telling her how she should "have clearly known that [she] was his[.]" (*Id.*) The victim testified that Summers had a knife with him, and that he was "rubbing it up and down [her] leg and telling [her] that [she] needed a reminder of who [she] belonged to." (Tr. at 41). The victim testified that Summers then took the knife and carved his first initial, "C," in the inside of her right ankle. (Tr. at 42). The victim testified that she begged Summers not to before he did it, but he did anyway and then made her clean up the blood. (Tr. at 42).

{¶20} The victim testified that Summers took her phone while on Dull Road and sent a message from her phone to his saying, "I won't cut myself again," making it look like she had cut herself. (Tr. at 43). The victim testified that before she left that night the two had sexual intercourse again. (Tr. at 43). The victim testified that she did not tell anyone about the incident, stating that "at that

point he had raped [her] and had cut [her], and [she] knew he was capable of just about anything if he was willing to do that." (Tr. at 44).

{¶21} The victim testified to another incident where her parents traveled out of town and Summers learned of it and came to her house. (Tr. at 45-46). She testified that Summers penetrated her anally and then forced her to orally pleasure him afterward. (Tr. at 46-47). The victim testified that the incident made her sick, that it "was hard to breathe" and "hard to walk." (Tr. at 47).

{¶22} The victim testified that incidents then started happening during school when basketball started her junior year. According to the victim multiple incidents occurred where Summers digitally penetrated her on the bus under a blanket to and from games. (Tr. at 48). The victim also testified that during practice Summers called her into the locker room to yell at her for lying to him about where she had been over the weekend, and that Summers initiated sexual intercourse with her in the locker room. (Tr. at 50). The victim testified that Summers told her that "we wouldn't want you to hurt yourself again and cut yourself again, would we?" (Tr. at 51). The victim testified that Summers occasionally would have sex with her after basketball practices during her junior year as well, that she felt forced to do so, and that it happened five to ten times. (Tr. at 52).

{¶23} The victim testified to an incident in January of 2011 where Summers found out she was still dating her boyfriend and Summers got angry. (Tr. at 53). Summers told the victim that she "needed a reminder that [she] belonged to him." (*Id.*) The victim testified that Summers then cut into her ankle again, and retraced the "C" he had cut into her before. (*Id.*) The victim testified that at the date of trial she still had a scar from Summers cutting her.

{¶24} The victim then testified that similar sexual incidents continued to occur through her junior year of high school into her senior year and through high school graduation in 2012. (Tr. at 58). She testified that the summer after graduation Summers' wife found out and started threatening her. (*Id.*) The victim testified that despite Summers' wife finding out, Summers would continue to message her, telling her that he needed to meet her, expressing that he was going to kill himself. (Tr. at 60). The victim testified that Summers had said before that he had contemplated suicide and that if he did kill himself he was going to take the victim with him. (Tr. at 60). The victim also testified that other times Summers said he would leave a suicide note "making sure that [she] was blamed for it." (Tr. at 60). The victim testified that she continued to get phone calls and threats from both Summers and his wife. (Tr. at 61).

{¶25} The victim testified that the sexual contact continued to occur when she was at college until October of 2012. She testified that Summers told her he

was going to "ruin" her, and do "whatever it took." (Tr. at 64). The victim testified that Summers sent her pictures of her boyfriend's house, and told the victim that he was going to hurt a member of her family. (Tr. at 64).

{¶26} The victim testified that she was having trouble sleeping and eating, so she finally told her mother about the incidents. (Tr. at 65). The victim testified that afterward she went with her mother and spoke to the police.

{¶27} Before the victim's direct-examination concluded on the third day of trial, the court took a lunch recess. During the recess, the parties negotiated a plea whereby Summers would plead guilty to 8 counts of Sexual Battery in violation of R.C. 2907.03(A)(7), all felonies of the third degree, in exchange for the State dismissing the remaining charges.[2]

{¶28} When the court reconvened later that day on August 7, 2013, Summers entered the written negotiated plea and the court conducted a Criminal Rule 11 colloquy with Summers ensuring that his pleas were knowingly, intelligently and voluntarily given. After Summers entered his guilty pleas, the court accepted them and found Summers guilty, setting sentencing for a later date. An entry reflecting this was filed August 26, 2013. (Doc. 285).

{¶29} On October 10, 2013 a sentencing hearing was held. At the hearing, one of the victim's former friends gave a statement indicating that she felt

---

[2] The specific counts of the indictment Summers pled guilty to were counts 3, 5, 7, 10, 13, 15, 36, and 44. As part of the agreement the State agreed that no further charges would be filed in the matter. (Doc. 279).

Summers was a good person and professional and that she felt the victim was a willing participant. One of Summers' friends also gave a statement that she felt Summers was remorseful and would not make the same mistake again. She also stated that she felt the victim was a willing participant and only made the accusations to not disappoint her parents. Summers' counselor also made a statement indicating that Summers had taken responsibility for his actions. Summers' wife made a statement pleading for mercy from the court, stating that Summers had changed. Summers himself then made a statement on his own behalf, accepting fault for the "inappropriate relationship." Summers' attorney then made an argument on his behalf.

{¶30} The victim's parents then both made statements before the court, requesting that Summers be given maximum consecutive sentences totaling 40 years. The victim's sister gave a statement making a similar request. Finally, the victim made a statement, stating that she had been hurt "physically, mentally, and emotionally" by Summers and that she would "be forever changed by what Mr. Summers did to [her]." (Tr. at 45). The victim continued, stating that when she looked back on her high school years she "remember[ed] the sleepless nights of crying and nightmares, the physical hurt and injuries, the emotional abuse, lack of appetite, and the ongoing hell [Summers] put [her] through." (Tr. at 45). The victim stated that "I remember having to isolate myself from my family and

friends. I felt like a zombie. I was not living life. I was living hell on earth." (Tr. at 45).

**{¶31}** After hearing the arguments at sentencing, the court ultimately ordered Summers to serve 30 months in prison on each of the eight counts, to be served consecutively for an aggregate prison term of 20 years. A sentencing entry reflecting this was filed October 22, 2013. (Doc. 309). It is from this judgment that Summers appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY IMPOSING CONSECUTIVE [SENTENCES] ON APPELLANT WHICH SENTENCE WAS AN ABUSE OF DISCRETION AND WAS [IN] VIOLATION OF THE PURPOSES AND PRINCIPLES OF SENTENCING.**

**ASSIGNMENT OF ERROR 2**
**CONSECUTIVE SENTENCES CUMULATING [sic] IN A TERM OF TWENTY YEARS WAS NOT CONSISTENT WITH NOR PROPORTIONATE TO SENTENCES IMPOSED IN SIMILAR CASES FOR SIMILAR OFFENDERS.**

**ASSIGNMENT OF ERROR 3**
**OHIO SEXUAL BATTERY STATUTE 2907 AS APPLIED TO SCHOOL TEACHERS IS UNCONSTITUTIONAL AND VIOLATIVE OF THE EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT.**

*First Assignment of Error*

**{¶32}** In Summers' first assignment of error, he argues that the trial court abused its discretion by imposing consecutive sentences. Specifically, Summers

contends that the trial court's findings do not support consecutive sentences in this case.

**{¶33}** In order to impose consecutive sentences in this case the trial court was required to make certain specific findings on the record, pursuant to R.C. 2929.14(C)(4). *State v. Peddicord*, 3d Dist. Henry No. 7-13-12, 2014-Ohio-2849, ¶ 7, citing *State v. Hites*, 3d Dist. Hardin No. 6-11-07, 2012-Ohio-1892, ¶ 11. While the trial court is required to make the specific findings, it is not required to list its reasoning for making the findings. *State v. Stairhime*, 3d Dist. Defiance No. 4-13-06, 2014-Ohio-1791, ¶ 51; *State v. Hill,* 3d Dist. No. 7–12–11, 2013-Ohio-3873, ¶ 22. "Furthermore, the sentencing court is not required to recite any 'magic' or 'talismanic' words when imposing consecutive sentences." *State v. Bever*, 4th Dist. Washington No. 13CA21, 2014–Ohio–600, ¶ 17, citing *State v. Clay*, 4th Dist. Lawrence No. 11CA23, 2013–Ohio–4649, ¶ 64. However, it must be clear from the record that the sentencing court actually made the required statutory findings. *State v. Alexander*, 1st Dist. Hamilton Nos. C-110828, C-110829, 2012-Ohio-3349, ¶ 16. A failure to make the findings required by R.C. 2929.14(C)(4) renders a consecutive sentence contrary to law. *State v. Stamper*, 12th Dist. Butler No. CA2012-08-166, 2013-Ohio-5669, ¶ 23.

**{¶34}** With respect to the consecutive sentence issues raised in this case, R.C. 2929.14(C)(4) states,

**(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:**

**\* \* \***

**(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.**

**\* \* \***

{¶35} In this case, with regard to consecutive sentences, the trial court made the following findings at the sentencing hearing.

**The court will impose those sentences to be consecutive in nature, finding that consecutive sentences are necessary to protect the public from future crimes by this offender and that they are not disproportionate to the seriousness of this conduct and the danger he poses to the public.**

**Further, that these multiple offenses were committed as part of a course of conduct and that the harm caused by these multiple offenses so committed is so great and unusual that no single prison term \* \* \* could adequately reflect the seriousness of this conduct that brought about his conviction for these offenses.**

(Oct. 10, 2013 Tr. at 58). The same language was also used in the trial court's judgment entry. (Doc. 309).

-15-

**{¶36}** The language used by the trial court at the sentencing hearing and in its judgment entry clearly mirrors and satisfies the findings required by R.C. 2929.14(C)(4) to impose consecutive sentences. Thus we cannot find under the facts and circumstances in this case that the trial court's imposition of consecutive sentences was improper.

**{¶37}** Despite the trial court's clear findings, Summers contends that the trial court's findings were not supported in the record. However, the trial court is not required to support its findings for consecutive sentences, merely to make the required findings. *State v. Stairhime*, 3d Dist. Defiance No. 4-13-06, 2014-Ohio-1791, ¶ 51. Nevertheless, in this case the trial court did make extensive findings both at the sentencing hearing and in its judgment entry to support its decision to impose greater than minimum sentences and consecutive sentences. After stating that it had considered all of the appropriate statutory criteria, the testimony from trial, the letters and pre-sentencing reports and the statements at the sentencing hearing, the trial court made the following findings.

> **Those sentencing factors for the record and for the entry from today's proceedings so that the record is clear should include that the mental injury suffered by the victim in this case due to the offender's conduct was exacerbated because of her age, and she has in fact suffered serious psychological harm. Again, the defendant's position of trust in the community as a teacher and coach was related to the offense and that position and his position as a teacher and coach obligated him to prevent such criminal offenses and to bring others who might commit that kind of offense to justice.**

> **Further, that profession of teacher and coach was used to facilitate this offense and brought about his relationship with the victim that did in fact facilitate the offense.** * * *
>
> **\* \* \* [T]he court notes that [Summers'] motivation in these offenses were for his own personal feelings of seeking to be accepted and loved and cared for and feel validated, and he took advantage of his position as teacher and coach in his relationship with the victim in facilitating these offenses over an extended period of time.**
>
> **As he acknowledged in his statement, there were numerous times going all the way back to the beginning of this relationship that resulted in these offenses even when viewed from the perspective of the defendant, as related to the court, when he could have used that position to teach and guide and put the interests of the student first, and he failed to do so, and instead did what he felt he wanted to do to satisfy his own needs.**

(Oct. 10, 2013 Tr. at 55-57).

{¶38} The preceding statements make clear that the trial court made findings to support its sentencing decision beyond those required by the statute. In sum, Summers' arguments that the trial court did not weigh certain sentencing aspects in his favor are not well-taken as they are 1) not required, and 2) were made in any event. As the trial court made the required statutory findings, Summers' first assignment of error is overruled.

*Second Assignment of Error*

**{¶39}** In Summers' second assignment of error, he argues that his aggregate 20 year prison term was not consistent with, nor proportionate to, sentences imposed in similar cases for similar offenders.

**{¶40}** "A defendant alleging disproportionality in felony sentencing has the burden of producing evidence to 'indicate that his sentence is directly disproportionate to sentences given to other offenders with similar records who have committed these offenses * * *.'" *State v. Ewert*, 5th Dist. Muskingum No. CT2012-0002, 2012-Ohio-2671, ¶ 33, quoting *State v. Breeden*, 8th Dist. Cuyahoga No. 84663, 2005-Ohio-510, ¶ 81. If a defendant fails to argue to the trial court that his sentence is not consistent with or proportionate to sentences imposed for similar crimes committed by similar offenders, then the defendant waives that issue for appeal. *State v. Norman*, 3rd Dist. Seneca No. 13-13-50, 2014-Ohio-3010, ¶ 17 citing *Ewert* at ¶ 31 (additional citations omitted).

**{¶41}** At the outset, we would note that Summers did not present this issue to the trial court, and therefore waived it for purposes of appeal. Nevertheless, even disregarding the waiver, Summers has not established that the trial court's sentence was disproportionate in this case. Summers was ordered to serve 30 months in prison on each of the eight sexual battery charges he pled guilty to, which was half of the maximum possible 60 month prison sentence for each

conviction. As illustrated in the previous assignment of error, the trial court made findings to support the imposition of its sentence and specifically stated it had considered the requisite sentencing statutes.

**{¶42}** In addition to the trial court's findings, we would note the testimony of the victim presented at trial, which indicated that for a period of over two years Summers compelled the victim, who was his student, to repeatedly engage in sexual acts through constant threats. The testimony indicated that Summers went so far as to use a knife to carve his initial into the victim more than once so that she would be reminded "she was his." The victim also testified that Summers continually threatened her safety, the safety of her boyfriend and her family, and that Summers threatened to harm himself and blame the victim for it in order to compel her to engage in the sexual relationship.

**{¶43}** In arguing that his sentence was disproportionate, Summers relies heavily on *State v. Parker*, 193 Ohio App.3d 506, 2d Dist. No. 10CA0074, 2011-Ohio-1418.[3] In *Parker*, the Second District Court of Appeals modified a defendant's sentence in a Sexual Battery case. In that case the court found that where the defendant was a first time offender and had only a very brief relationship with a student that did not involve any compulsion, a fifteen year prison sentence was excessive, especially since the trial court seemed to base its

---

[3] Summers also cites various other trial court cases that are not binding on this court and provide little persuasive authority for our appellate review of this matter.

sentence on a desire to give the defendant a lengthy sentence to prevent him from having a relationship with the victim. *State v. Cameron*, 2nd Dist. No. 2012-CA-86, 2013-Ohio-4397, ¶¶ 16-17 (analyzing and distinguishing *Parker*).

{¶44} The case before us is clearly different than *Parker* for a wide variety of reasons. In *Parker*, the defendant and the victim only met twice and no sexual intercourse occurred, rather merely digital penetration. Here, sexual intercourse occurred frequently seemingly whenever desired by Summers in addition to other sexual acts desired by Summers.

{¶45} In *Parker* there was no indication of force or compulsion. In fact, the victim in *Parker* believed that she was "in love" with the defendant. In the case before us the victim's testimony indicated severe threats from Summers, infliction of physical injury with a knife, and a heavy degree of compulsion to get the victim to engage in the sexual acts.

{¶46} Additionally, in *Parker* the defendant was charged with and pled guilty to *four* counts of Sexual Battery, which all occurred in a matter of *weeks*, whereas here Summers pled guilty to *eight* counts of Sexual Battery and the crimes spanned over two *years*.

{¶47} Finally, in *Parker* there was a clear indication that the prison term was set primarily to get a desired future result, namely to prevent any possible relationship between the defendant and the victim. There is no such indication

from the record before us that the trial court had a specific goal and created a "sentencing package" to achieve that goal. Thus *Parker* is clearly distinguishable from the case before us.

{¶48} Accordingly, based on all the facts and circumstances of this case, even if Summers had not waived this claim, we cannot find that the trial court's sentence was disproportionate as it was supported in the record and Summers has not met his burden establishing that the sentence was disproportionate. Therefore Summers' second assignment of error is overruled.

### Third Assignment of Error

{¶49} In Summers' third assignment of error, he argues that the Sexual Battery statute as applied to school teachers, R.C. 2907.03(A)(7), is unconstitutional.

{¶50} Initially we would note that Summers failed to make the argument that R.C. 2907.03(A)(7) was unconstitutional at the trial court level. The "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." *State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus. Thus Summers has waived this argument for this appeal.[4]

---

[4] At oral argument Summers also seemed to concede this argument.

{¶51} Nevertheless, this exact challenge was previously addressed by the Ninth District Court of Appeals in *State v. Shipley*, 9th Dist. Lorain No. 03CA008275, 2004-Ohio-434, ¶¶ 80-81. In *Shipley*, the Ninth District conducted the following analysis.

> **R.C. 2907.03(A)(7) specifically penalizes teachers, administrators, coaches and other individuals in a position of authority with a public school for an act for which other individuals, not encompassed within another part of the same statute, would not be penalized. See R.C. 2907.03 and 2907.04. The legislature explained in enacting the statute that it intended to protect individuals in a variety of situations where another might take unconscionable advantage of that individual. See 1974 Committee Comment to R.C. 2907.03(A)(7). In 1994, the legislature amended the statute to include 2907.03(A)(7) in response to a case which held that teachers did not fall under any of the classifications in the prior statute. See *State v. Noggle*, 67 Ohio St.3d 31, 1993-Ohio-189.**
>
> **In this case, R.C. 2907.03(A)(7) is rationally related to its intended purpose of preventing teachers from taking unconscionable advantage of students by using their undue influence over the students in order to pursue sexual relationships. Defendant has failed to show that the statute bears no rational relationship to a legitimate government interest.**

*Shipley*, ¶¶ 80-81.

{¶52} Thus even if Summers' argument was not waived, we concur with the Ninth District's assessment in *Shipley* as there appears to be a clear rational basis for the statute. Summers has in no way demonstrated that the strong presumption of constitutionality afforded to statutes has been overcome in this case. Accordingly, Summers' third assignment of error is overruled.

{¶53} For the foregoing reasons, Summers' assignments of error are overruled and the judgment of the Mercer County Common Pleas Court is affirmed.

***Judgment Affirmed***

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**